PATRICIA A. GRAMS, APPELLEE, V. DANIEL S. GRAMS, APPELLANT.

624 N.W. 2d 42

Filed March 6, 2001. No. A-99-1467.

John O. Sennett and Julianna S. Jenkins, of Sennett, Duncan & Borders, for appellant.

Michael R. Snyder, of Snyder & Hilliard, for appellee.

HANNON, SIEVERS, and MOORE, Judges.

MOORE, Judge.

## I. INTRODUCTION

Daniel S. Grams (Dan) appeals from the decree of dissolution filed October 20, 1999, by the district court for Kearney County which dissolved the marriage of Dan and Patricia A. Grams (Pat). For the reasons stated below, we affirm as modified.

## II. BACKGROUND

The parties became engaged while Dan was attending the University of Nebraska at Lincoln, pursuing a bachelor's degree in general agriculture. Pat did not attend college due to the cost, but worked full time while Dan attended college, saving most of her money. Dan graduated in May 1980, and the parties married on August 30 that same year. After the parties' marriage, Pat chose to stay home to raise their children as agreed upon by the parties. After his graduation, Dan worked as a hired man for his father and rented some farm ground with his brother David. Dan and David farmed from 1980 to 1988 under the name Grams Brothers and for their father's company, Grams Farms, receiving a salary. Grams Brothers rented farm ground and used the father's equipment. Grams Brothers purchased its first parcel of farm real estate in 1982 or 1983. During this time period, Dan also purchased shares in Grams Farms from his parents beginning in 1981.

The assets of Grams Farms were divided in 1988, with Dan, his father, and Dan's three brothers all forming separate corpo-

rations. Dan formed Longhorn Farms, Inc., surrendering his share of Grams Farms stock and receiving one-fourth of the machinery, grain, and certain other assets of Grams Farms. Additionally, one-fourth of the bank debt of Grams Farms was transferred into Longhorn Farms. Dan is the sole shareholder in Longhorn Farms, which owns assets valued at over $1 million and which raises corn and other grains rather than livestock. The first crop year for Longhorn Farms was 1989. Dan also owns 50 percent of Grams Brothers, which is an informal partnership between Dan and David. Grams Brothers owns, through Dan and David individually, 1,800 acres of farmland in Kearney and Franklin Counties, amounting to over 2.2 million dollars' worth of real estate assets. Grams Brothers rents this farm real estate to Longhorn Farms and to David's corporation, which pay rent to Grams Brothers determined year to year based on the land payment, interest, taxes, and other expenses incurred by Grams Brothers on the real estate, rather than for its true fair market value. In addition to the 1,800 acres owned by Grams Brothers, Dan and David rent 900 acres and custom farm another 1,500 acres. Dan also owns a 10-percent interest in his parents' family farm corporation, B&G Corp., valued at $160,000, the result of a gift from his parents. Dan's projected net income for 1999 was $103,000, although he testified at trial that Longhorn Farms had not made a profit for the last 2 to 3 years. Dan admitted on cross-examination at trial that in 1998 he purchased more farm equipment, and through Grams Brothers, he made more principal payments on land loans than in any of the previous 3 years. However, Dan further testified that he did not purchase any equipment in 1998 that was not necessary to replace worn out machinery and that he did not prepay or double pay anything with respect to Grams Brothers' land, paying only what was required on principal under the various land contract terms.

Pat has been the primary caregiver for the parties' four children born in the 7 years from 1982 to 1989, whose ages were 9, 11, 14, and 16 at the time of trial. Pat began part-time employment as a postal relief person with the Upland, Nebraska, post office in 1985 after their second child was born, passing up several opportunities with the post office involving travel or full-time work which would take her away from caring for the par-

ties' children. In the approximate 2-year period prior to filing for the divorce, Pat's part-time employment with the post office earned her $4,000 to $5,000 per year. Since about 1982 or 1983, Pat has also been self-employed part time during the school year hanging wallpaper and painting, which earns her an additional $5,000 to $6,000 per year. She wallpapers and paints from 8 a.m. to 4 p.m. in order to be home when the children return from school. Pat does not paint or wallpaper during the summer, in order to be involved in the children's summer activities such as playing ball, biking, swimming, and 4-H. During the marriage, Pat assisted in the farming operation by moving equipment from one farm to the next during planting and harvest, running for parts, driving a truck, bookkeeping, yard and outbuilding maintenance, mowing, painting, minor repairs, meal preparation, housework, gardening, and canning. Besides caring for their children, homemaking, and farmwork, Pat's other demonstrated job skills consist of restaurant cooking, bar service, clerical work, babysitting, and sewing.

Pat testified at trial that she brought approximately $50,000 in savings into the marriage. Pat further testified that she used some of the original $50,000 to purchase the parties' first car in 1981, now driven by their teenage daughter. Pat did not recall how much she contributed toward the purchase of that first car, but testified that the purchase price was approximately $11,000. Dan agreed that the purchase price was approximately $11,000, but testified that in addition to whatever amount Pat contributed, he contributed the proceeds from selling a car that he owned while he was in school. Pat testified that she loaned $30,000 of her original $50,000 in savings to Grams Brothers, and she also testified to loaning $7,000 to Longhorn Farms. Grams Brothers paid back $27,000 of the principal plus the interest then due to Pat in the spring of 1997 after she and Dan separated, having previously paid back the other $3,000 of principal in 1984. Pat testified at trial that she did not know whether Longhorn Farms ever paid back the $7,000 loan. At trial, Dan did not recall the existence of the Longhorn Farms loan, but agreed that Pat had loaned $30,000 to Grams Brothers. Pat also testified that she used approximately $10,000 of her premarital savings to make the downpayment on the parties' first home. Pat testified that

when they sold their first home, they invested the proceeds of $27,000 into improvements in the current family residence in Upland, which Longhorn Farms purchased from Dan's parents in 1993. Longhorn Farms borrowed $50,000 toward the purchase price from the bank and another $50,000 from Pat's mother. At trial, Dan was not asked about Pat's contribution toward the downpayment on the parties' first home or about how the proceeds from the sale of the first home were spent. Dan did agree, however, that the parties made substantial improvements and renovations after purchasing the current family home. At the time Pat filed for divorce, a little over $10,000 of Pat's original $50,000 in savings remained in a certificate of deposit (CD), which she later cashed into an account to help pay her attorney fees in these proceedings.

The parties separated in November 1996 prior to Pat's filing a petition for dissolution of marriage on September 3, 1998. Pat and the children lived in the Upland family home through December 1997. From January through May 1998, Pat also rented a home in Minden where she and the children lived during the school week. Pat and the children lived in the family residence in Upland during the summer of 1998, moving full time into the Minden rental house in approximately September 1998. During their separation, Dan gave Pat $1,342 per month for her and the children to live on, paying himself an additional $1,002 per month in salary. Pat also spent approximately $17,000 of her premarital savings to support herself and the children during the separation. After Pat filed for divorce, she began receiving temporary child support payments of $2,139 per month and temporary alimony payments of $1,000 per month, both effective as of September 1, 1998.

Dan moved back into the family home in Upland in October 1998, which he was awarded in the divorce decree. Dan's income is augmented by various payments made and benefits provided to him by Longhorn Farms. With respect to the family home in Upland, Longhorn Farms makes the mortgage payment of $5,000 per year plus interest, as well as paying the residential home insurance, approximately $300 per month for the real estate taxes, repairs and upkeep on the residence and 20-acre tract on which it is located, and utilities of $100 to $220 per

month. Longhorn Farms also pays the parties' and their children's health insurance, amounting to $300 per month, pays Dan's pickup truck insurance, and pays Dan's cellular telephone bill of between $60 to $120 per month. Dan admitted on cross-examination that he purchased a stereo for his residence with a Longhorn Farms check, although he initially denied that the corporation purchased household goods to furnish his home after the parties separated.

Trial was held on June 14 and 15, 1999. Dan presented the testimony of David Rosenthal, a certified public accountant, as to Dan's income derived through his various entities. Rosenthal testified regarding exhibit 42, an analysis of tax returns for 1995 through 1998, summarizing Dan's income and depreciation add back, as well as analyzing principal payments on equipment contracts, equipment purchases, and principal payments over a 4-year period. Rosenthal explained the carryover of deferred income from 1 year to another, resulting from tax planning, and the withholding of grain from the market from one tax year to another to keep Dan out of a higher income tax bracket. For the 1998 crop year, Dan had $148,000 of net income that was not reported on his 1998 tax return, which would be carried over into 1999. Dan also had $19,800 worth of 1998 farm program payments for the 1998 production year that were not reported on his 1998 income tax return.

Rosenthal testified that based on the amount of reported income on Dan's tax returns, Dan's average yearly earnings plus depreciation for 1996 through 1998 was $74,375. The average taxes paid for those 3 years was $7,480, resulting in average aftertax earnings of $66,895, or $5,575 per month. Rosenthal admitted on cross-examination that it would not have been misleading to average all 4 years represented on exhibit 42. Dan's average yearly earnings over the 4 years represented on exhibit 42 were $83,880 with average taxes paid of $7,227, resulting in average aftertax earnings of $76,653, or $6,388 per month.

A decree of dissolution was filed on October 20, 1999, dissolving the marriage of the parties and awarding custody of the minor children to Pat subject to Dan's reasonable right of visitation. Dan was ordered to pay the children's medical insurance, as well as 90 percent of all uncovered medical, dental, and opto-

metric expenses. The court found that Pat made $963 per month net income, while Dan made $6,388 per month after taxes based on the previous 4 years' earnings as reported on his income tax returns and had an additional $148,000 of carryover income from 1998 and government payments. The court accepted Pat's argument that it should calculate Dan's child support obligation based on his earning capacity, finding that Dan's total earning capacity, based on the average of the past 4 years' income, carryover income, unreported income, and farm program payments, was $8,033 per month. The court ordered child support for the four children, based on Dan's earning capacity, in the total amount of $2,283 per month, beginning November 1, 1999. The amount of child support for three children was $2,115, for two children was $1,768, and for one child was $1,211.

With respect to the division of property, the court found that Pat had primarily raised the children and maintained the household, while Dan primarily performed most of the farming responsibilities, stating that this division of labor and responsibilities should result in a 60-40 split of the marital estate. The court rejected Dan's argument in favor of a 50-50 split based on *Martin v. Martin*, 215 Neb. 508, 339 N.W.2d 754 (1983), *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982), and *Patton v. Patton*, 203 Neb. 638, 279 N.W.2d 627 (1979), finding that under the circumstances of the present case, a 50-50 split would still enable Dan to pay his obligations. The court divided the property based on the following calculation of the marital estate:

Property Division Summary

| Items Received | Dan | Pat |
|---|---|---|
| Property and Assets Awarded | $2,416,790 | $ 73,344 |
| Less Liabilities Assumed | | |
| Grams Brothers | ($ 402,683) | |
| Longhorn Farms | ($1,186,834) | 0 |
| Less Assets Brought Into Marriage | 0 | ($ 50,000) |
| Less Gifts and Inheritances | ($ 160,109) | ($ 5,660) |
| Total Liabilities & Deductions | $1,749,626 | $ 55,660 |
| Marital Estate Possessed by Each | $ 667,164 | $ 17,684 |
| Total Marital Estate | $684,848 | |
| One-half of Marital Estate | $ 342,424 | $342,424 |

In order to equalize the division of the marital estate, Pat was awarded the parties' one-half interest in "Pearl's Farm," subject to the indebtedness thereon, which had a net value of $90,000. To further equalize the division of the marital estate, Pat was awarded a judgment of $234,740, which was to be paid in 10 equal annual installments with interest from December 1, 1999. In reaching this division, the court allowed Pat a premarital credit of $50,000, finding that the $50,000 provided by Pat enhanced the parties' finances at the beginning of their marriage. The court stated that the fact that the money could not all be traced to present assets should not preclude Pat from receiving a credit.

The court found both Pat's request of $2,500 per month in alimony and Dan's argument in favor of paying only $500 per month to be extreme under the circumstances. The court noted, after considering the relative circumstances of the parties once the award of child support and property division was in place, that an amount of $1,250 per month, beginning November 1, 1999, was a fair award of alimony. The parties had agreed that a period of 9 years was an appropriate duration period.

Dan filed a motion for new trial on October 29, 1999, which was overruled by the court in its order filed December 1, 1999. Subsequently, Dan perfected this appeal.

### III. ASSIGNMENTS OF ERROR
Dan asserts that the district court abused its discretion in (1) determining the amount of the alimony awarded to Pat, (2) determining Dan's earning capacity and the resulting child support payment, (3) determining the division of the marital estate, and (4) allowing Pat a $50,000 premarital credit.

### IV. STANDARD OF REVIEW
■ In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

■ In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its

own independent conclusions with respect to the matters at issue. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Sears v. Larson*, 259 Neb. 760, 612 N.W.2d 474 (2000).

## V. ANALYSIS

### 1. ALIMONY AWARD

■ Dan first asserts that the district court abused its discretion in determining the amount of the alimony awarded to Pat. The court awarded Pat alimony in the amount of $1,250 per month, beginning November 1, 1999, with payments for a period of 9 years. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id.*

### (a) Income-Producing Nature of Pearl's Farm

Dan argues that the alimony judgment is inequitable, when considered together with the division of property, particularly given that Pearl's Farm was awarded to Pat. Dan contends that while there is no evidence in the record isolating either the cash rent payments made on Pearl's Farm or the value of the crops produced thereon, the court, in determining alimony, should have at least assumed a rate of return on the $90,000 of equity value. Dan argues that due to the fact that Pat received an award

of farmland, not just as an equity-building asset but as a cash-building asset, the court must account for this income by reducing the monthly alimony awarded to Pat.

While the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately. *Venter v. Venter,* 249 Neb. 712, 545 N.W.2d 431 (1996). The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Kalkowski v. Kalkowski, supra.*

The Nebraska Supreme Court has considered the impact of income-producing properties on the award of alimony. In *Ainslie v. Ainslie,* 249 Neb. 656, 545 N.W.2d 90 (1996), the court considered whether the wife, who had two trust funds which were nonmarital property, should make an alimony payment to the husband. Although the trust funds were not subject to division in the property settlement, the court found that they could properly be taken into account when determining alimony. In so ruling, the court noted that in addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 1998), a court setting alimony is to consider the income and earning capacity of each party, as well as the general equities of each situation. *Id.* Disparity in income or potential income may partially justify an award of alimony. *Id.* In entering a decree for alimony, the court may take into account all of the property owned by the parties at the time of entering the decree, whether accumulated by their joint efforts or acquired by inheritance, and make such award as is proper under all the circumstances disclosed by the record. *Id.* The court also considered the fact that the husband had been awarded practically all of the income-producing assets accumulated by the parties in making its alimony award in *Ritz v. Ritz,* 229 Neb 859, 429 N.W.2d 707 (1988). In *Hafer v. Hafer,* 3 Neb. App. 129, 524 N.W.2d 65 (1994), this court held that not only is the earning capacity of the spouse to be considered in determining if alimony is appropriate, but also the fact that one of the parties has received all of the income-producing property from the marriage.

Our review of the record does not lead us to a conclusion that the award of Pearl's Farm to Pat will either increase or decrease

the disparity in the parties' incomes for purposes of the court's alimony award. During trial, Rosenthal was asked but did not know how much, if any, income was generated from Pearl's Farm or how much the debt service was. Dan offered no evidence or other proof that there was any net income generated from Pearl's Farm or how much of the net income was spent on annual debt service payments. Additionally, while Pat has been awarded this one potential income-producing asset, Dan has clearly been awarded the bulk of the income-producing assets accumulated during the marriage. Accordingly, we find nothing unreasonable or untenable in the amount of the court's alimony award in light of the award of Pearl's Farm to Pat.

### (b) Examination of Statutory Factors

Dan also asserts that an examination of the statutory factors under § 42-365 does not support the trial court's award of alimony. Factors which should be considered by a court in determining alimony include (1) the circumstances of the parties; (2) the duration of the marriage; (3) the history of contributions to the marriage, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities; and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); § 42-365.

This was a 19-year marriage. At the time of trial, Pat was 40 years old and in good health. Dan was 41 years old, and there was no evidence that he was in other than good health. Throughout the marriage, Pat contributed her earnings from various part-time employments to pay living expenses and also contributed to the family's support through the use of her $50,000 of premarital savings. In committing herself to a career as the primary caregiver for the parties' four children, Pat has bypassed opportunities at the post office requiring full-time work or travel. Dan has utilized his college degree in agriculture to build up an extensive farming operation with which to contribute to the family's support. Pat does not have a college degree, and her marketable job skills include postal relief work,

wallpaper hanging, painting, restaurant cooking, bar service, clerical work, babysitting, and sewing. There was no evidence presented that Pat could earn any more in any full-time conventional job than she does now at her two part-time positions.

Upon our review of the record, consideration of the statutory factors, earning capacity, and relative economic circumstances of the parties, we cannot say that the trial court abused its discretion either in awarding alimony or in the amount of that award. Accordingly, Dan's first assignment of error is without merit, and we affirm the trial court's award in that regard.

### 2. EARNING CAPACITY FOR PURPOSES OF CHILD SUPPORT

■ Dan next asserts that the district court abused its discretion in determining his earning capacity and the resulting child support payment, arguing that the court's calculation was too high and resulted in an unfair and inappropriate child support order. The main principle underlying the Nebraska Child Support Guidelines is the equal duty of both parents to contribute to the support of their children in proportion to their respective net incomes. *State v. Porter*, 259 Neb. 366, 610 N.W.2d 23 (2000). When earning capacity is used as a basis for an initial determination of child support under the Nebraska Child Support Guidelines, there must be some evidence that the parent is capable of realizing such capacity through reasonable effort. *Id.* In determining the amount of child support to be paid by a parent, the trial court shall consider the earning capacity of each parent and the guidelines provided by the Nebraska Supreme Court. *Cooper v. Cooper*, 8 Neb. App. 532, 598 N.W.2d 474 (1999). The parties' income from all sources shall be used, but if applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. *Id.* In paragraph D, the Nebraska Child Support Guidelines provide, in part: "Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources."

Although the record does not reflect the exact steps the court took in order to arrive at the final figure of $8,033 per month for

Dan's total earning capacity, Dan maintains in his brief on appeal that the court added Dan's average after-tax earnings of $6,388 per month, together with a figure of $1,233 per month, based on Dan's $148,000 of deferred income from 1998 averaged over a 120-month period, and an additional figure of $412 per month, based on the approximately $19,800 in 1998 farm program payments not reported on Dan's 1998 tax return divided by the 48-month period reported on exhibit 42, in order to reach the final figure. As the court order referenced Dan's after-tax earnings of $6,388 based on the last 4 years' earnings (i.e., 48 months) as reported on Dan's income tax forms, Dan's 1998 deferred crop production income of $148,000, and "government payments" in its order, this seems to be a reasonable approximation of the steps involved in the court's calculation. The choice of 120 months over which to average the $148,000 in deferred income, coincides with the 10 years from 1988, when Longhorn Farms was incorporated, to 1998 when Pat filed for divorce.

### (a) Inclusion of Deferred Income

Dan asserts that the court's decision to add his deferred 1998 income of $148,000 into his total earning capacity for purposes of calculating child support was in error as the $148,000 will be added into his 1999 income along with his other annual income and expense adjustments to arrive at his taxable 1999 income. Dan further asserts that the trial court's holding implies that the $148,000 of deferred income from 1998 is an accumulation of amounts over the term of the parties' marriage, beginning at the time of the incorporation of Longhorn Farms. Dan argues that since he held back $148,000 of his 1998 crop and sold it in 1999 to help equalize his 1999 income, there is no accumulation factor.

The record reveals that Dan carried over a part of each year's crop production into the next year as a tax planning device. The evidence adduced at trial showed that Dan had engaged in this process since at least the 1992 tax year. According to the evidence, this amount of deferred income varies from year to year depending on the market, the amount of grain produced, and other income generated in the current year. Rosenthal testified

on cross-examination that the decision whether to sell crops in the current crop year or defer the sale until the next year was made in an effort to maintain a consistent income level for tax purposes and to avoid a high income tax bracket. Rosenthal further testified that eventually this practice will "catch up" to Dan, and hypothetically, this would occur on "the last income tax return" that he files. Pat asserts that since the 1998 tax return is the last return to be filed by the parties during their marriage, it is appropriate to factor in the carryover income.

The 4 tax years that the court utilized in arriving at Dan's average monthly after-tax income each included deferred income from crop sales from the previous year. Rosenthal testified that in 1994, Dan carried over $132,000 of net income which was then reported on his 1995 tax return; that for 1995, Dan carried over $211,000 to his 1996 tax return; that $311,000 was carried over from 1997 to 1998; and that $148,000 was carried over from 1998 to 1999. Rosenthal did not have the separate figure for net income carried over from 1996 to 1997, but testified that the 1996 carryover amount was included in Dan's 1997 income tax return. Based on the figures represented on exhibit 42, Dan's total taxable income for the 4 tax years utilized by the court were as follows: $112,394 for 1995, ($63,645) for 1996, $211,489 for 1997, and $75,281 for 1998.

By adding the 1998 deferred income into the formula, the district court essentially utilized an inflated income figure since the 4-year average already included deferred income in each of these years. The 1998 crop production will be included in Dan's 1999 income, from which he will pay child support and alimony. It should also be noted that the 1998 stored crop was included as an asset of Longhorn Farms which was included in the marital estate that was divided by the court. We conclude that it was error to include the deferred income from 1998 in the computation of Dan's earning capacity for purposes of setting child support. Accordingly, we find the child support should be determined based upon Dan's average net monthly income, which, based upon the court's 4-year average, was $6,388, together with $412 per month, representing the 1998 farm program payments averaged over 4 years, which Dan does not dispute, for a total of $6,800 net monthly income.

### (b) Depreciation Offset by Cost
### of Equipment Purchases

Dan also argues with respect to the determination of his earning capacity for child support purposes, that the average cost of equipment and machinery purchases for Longhorn Farms should be deducted from his income to offset the depreciation added back in pursuant to the Nebraska Child Support Guidelines. Dan contends that the court should have subtracted $2,575 per month from his earning capacity, based on the 4-year average equipment or machinery purchases reflected on exhibit 42. Paragraph D of the guidelines provides, in part: "If a party is self-employed, depreciation claimed on tax returns should be added back to income or loss from the business or farm to arrive at an annualized total monthly income." The guidelines do not mention any offset for purchases such as Dan has proposed.

The Nebraska Child Support Guidelines are applied as a rebuttable presumption, and all orders for child support shall be established in accordance with the provisions of the guidelines unless the court finds that one or both of the parties have produced sufficient evidence to rebut the presumption that the guidelines should be applied. *State v. Porter*, 259 Neb. 366, 610 N.W.2d 23 (2000). A court may deviate from the child support guidelines whenever the application of the guidelines in an individual case would be unjust or inappropriate. Nebraska Child Support Guidelines, paragraph C. Although Dan does not cite any case law supporting his assertion that the court should have deducted the costs of his equipment purchases in figuring his earning capacity, he does direct us to *State on behalf of Elsasser v. Fox*, 7 Neb. App. 667, 584 N.W.2d 832 (1998), wherein, this court found repayment of student loans to be an appropriate justification for deviation from the Nebraska Child Support Guidelines. Dan reasons that just as in *State on behalf of Elsasser*, wherein the father had to incur the expense of the student loan in order to obtain the education necessary to gain employment and produce income, Dan had to incur the expense of purchasing farm machinery and equipment in order to create the level of income currently enjoyed by Dan and his family.

The Nebraska Supreme Court recently addressed the issue of depreciation in *Gammel v. Gammel*, 259 Neb. 738, 612 N.W.2d

207 (2000). In *Gammel*, the husband, a self-employed trucker, argued that it was error for the trial court to treat expense pursuant to I.R.C. § 179 (1994 & Supp. IV 1998) (Section 179) as depreciation and add it back to his income for purposes of setting his child support obligation. Section 179 of the Internal Revenue Code allows taxpayers to elect to treat the cost of certain property as an expense which may be deducted from taxable income, in the absence of a carryover, in the year in which the property is placed in service. The husband argued that a Section 179 deduction should not be treated as depreciation because a Section 179 deduction reflects an actual cash expenditure, thus reducing the self-employed parent's available resources from which to pay child support. In rejecting this argument, the court noted that similarities exist between a Section 179 deduction and depreciation where depreciation is taken in the year property is first placed in service. The court found that a Section 179 deduction is, in effect, accelerated depreciation taken in the year property is placed in service. "The Nebraska Child Support Guidelines require that depreciation be added back to income whether such depreciation is taken in the year the parent makes a cash expenditure to purchase property or whether it is taken in a subsequent year when no cash expenditure has been made." *Gammel*, 259 Neb. at 743, 612 N.W.2d at 211. The court in *Gammel* recognized that other states have taken varying approaches to the treatment of depreciation in connection with the calculation of child support. The court reiterated that Nebraska clearly adopts the approach that depreciation should not be allowed to reduce monthly income in calculating child support, but, instead, depreciation should be "added back" to income. *Id.* at 743, 612 N.W.2d at 212.

Dan's argument that the court should deduct the cost of his machinery purchases as an offset to the addition of his claimed depreciation is essentially the same argument which was rejected by the court in *Gammel*. Because we are bound by the conclusions reached in *Gammel*, we likewise reject Dan's argument and find that the inclusion of depreciation as income in this case was consistent with the Nebraska Child Support Guidelines and did not constitute an abuse of discretion.

Dan also asks this court to consider that if Longhorn Farms were a subchapter C corporation rather than a subchapter S corporation for income tax purposes, it would be an independent taxpayer, and the depreciation expense would not be added back into Dan's total income. Dan contends that he is being unjustly penalized because he chose a corporate structure that benefits his business operations while minimizing his tax burden. Because this argument is not based upon the facts as they existed in this case, but on a hypothetical situation, we find this argument unpersuasive.

As a result of our conclusion that the district court erred in including 1998 deferred income as Dan's earning capacity, we modify the district court's child support calculations based on Dan's net monthly income of $6,800 and Pat's net monthly income of $963 as follows: $2,154 for four children, $1,988 for three children, $1,661 for two children, and $1,140 for one child. We affirm the district court's finding that depreciation should be included in the calculation of Dan's income without any offset for the cost of equipment purchases.

### 3. DIVISION OF MARITAL ESTATE

In his third assignment of error, Dan asserts that the district court abused its discretion in determining the division of the marital estate. The purpose of a property division is to distribute the marital assets equitably between the parties. *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000). The ultimate test for determining the appropriateness of the division of property is reasonableness as determined by the facts of each case. *Id.*

### (a) 50-50 Split of Marital Estate

With respect to the property division, Dan first contends that based on the facts and circumstances of this case, the court erred in not awarding him at least 60 percent of the marital estate. The division of property is not subject to a precise mathematical formula, but the general rule is to award a spouse one-third to one-half of the marital estate. *Meints v. Meints, supra.* Dan relies in part on *Patton v. Patton*, 203 Neb. 638, 643, 279 N.W.2d 627, 630-31 (1979), wherein the court stated:

> [W]here a wife is awarded alimony the court should divide the property in such a manner as to permit the husband the means of paying the judgment awarded to the wife. The record in this case clearly reflects that the petitioner, without the ranching and farming operation, has no means of producing income to pay the alimony award to the respondent.

Dan asserts that it is inequitable that he was awarded the large family home in Upland with an equity value of approximately $93,000 while Pat was awarded Pearl's Farm, an allegedly productive piece of farmland. There was, however, evidence that the home, which belongs to Longhorn Farms rather than Dan and Pat individually, had some special significance in Dan's family as it had been owned and built by his parents. As previously stated, there was no evidence as to the amount of either debt or income with respect to Pearl's Farm. Additionally, while Dan will no longer have the alleged income from Pearl's Farm, he will also not be burdened with the debt thereon, which Pat is assuming for 2000 and subsequent years. Our review of the record leads us to agree with the court that the division of labor and responsibilities between the parties over the course of the marriage should result in a 50-50 split of the marital estate and that under the circumstances of this case, a 50-50 split will still enable Dan to pay his obligations. Accordingly, we affirm the 50-50 division of the marital estate.

### (b) Allowance of $50,000 Premarital Credit

 Finally, Dan asserts that the district court abused its discretion in allowing Pat a $50,000 premarital credit. The trial court found that the $50,000 provided by Pat enhanced the parties' finances at the beginning of their marriage, stating that the fact that the money could not all be traced to present assets should not preclude Pat from receiving a credit. The division of property owned by the parties, including that owned at marriage or acquired by gift or inheritance, is to be determined by the facts in each case. *Frost v. Frost*, 227 Neb. 414, 418 N.W.2d 220 (1988). The burden of proof to show the source of all funds claimed as premarital is on the party claiming that those funds are premarital. *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d

777 (1997). Where there is nothing on the record to show the source of premarital funds, they should be considered part of the marital estate. *Id.* While the source of funds brought into a marriage is a consideration in the division of property, it is not an absolute. *Frost v. Frost, supra.*

Dan argues that Pat should have been given credit only for the CD valued at approximately $10,000 and the car, now driven by the parties' daughter, as the balance of Pat's $50,000 in premarital savings cannot be traced to any existing property. Dan asserts that it is unfair to credit Pat with $50,000 if the amount of $50,000 is not specifically accounted for in the value of the total property and assets awarded to Pat. Dan asserts that the total property and assets awarded to Pat, listed by the court at $73,344 in its property division summary, includes the CD valued at approximately $10,000 as well as the parties' first car valued by Dan at approximately $900 on the parties' joint property statement, but did not include the $37,000 loaned to Longhorn Farms and Grams Brothers. Dan contends that the loan amounts totaling $37,000 should be either added to the value of the total estate or deducted from the $50,000 premarital credit awarded by the court, leaving the difference of $13,000 as Pat's correct credit for her premarital property.

It has been a longstanding rule that when awarding property in a dissolution of marriage, property acquired by one of the parties through gift or inheritance, to which the exception first recognized in *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982), does not apply, and which property is readily identifiable and traceable to that party, ordinarily is set off to the individual receiving the inheritance or gift and is not considered a part of the marital estate. *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988). The Nebraska Supreme Court considered the tracing of premarital property in *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985). In *Rezac*, certain land and a veterinary clinic were purchased during the marriage. The husband suggested that these assets were actually purchased with proceeds from the sale of other property owned by him prior to the marriage, implying that the court should trace the premarital property through its disposition and reinvestment during the marriage so as to preserve the separate character for the newly acquired property.

The Nebraska Supreme Court upheld the trial court's decision to include these assets in the marital estate, stating:

> If this [tracing] were done, it would result in the party's having credit for the value of the property brought into the marriage and then a duplicate credit for the property acquired from those proceeds. Tracing property is generally an unworkable proposition because the parties have a tendency to suggest tracing only when there is an improvement in value. Although some courts find a justifiable reason for limited tracing of prior owned property, it is not error to restrict the credit to the identical property which is retained during the marriage or to the value of the property at the time of the marriage or when disposed of during the marriage.

*Id.* at 519, 378 N.W.2d at 198.

Presumably, from Pat's testimony, the $10,000 CD was purchased out of the loan money repaid to her by Grams Brothers at the time of the parties' separation. Both the CD and the car awarded to Pat in the divorce decree are assets that are identifiable and readily traceable to Pat's original $50,000 in savings. We can find no error in the trial court's allowing $10,000 of credit for the CD, nor can we find any error in the court's allowing credit for the car. While there was no specific determination by the trial court of the amount of credit which should be given for the car, Dan suggests that an additional $3,000 credit above the value of the CD is appropriate. We find that an additional $3,000 credit to Pat is appropriate under the circumstances.

■ We next address the $10,000 Pat contends she spent for the downpayment on the parties' first home. This court considered this same general issue in *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996). In *Gerard-Ley*, the husband asserted that the trial court erred in including certain real property in the marital estate, arguing that as this property was readily identifiable and traceable to the proceeds from the sale of his inherited bank stock, it should be set aside and considered non-marital property. The parties stipulated during the course of the trial that they took title to the property as joint tenants. In this court's analysis, we noted that when a husband and wife take title to a property as joint tenants, even though one pays all the

consideration therefor, a gift is presumed to be made by the spouse furnishing the consideration to the other, further noting that this presumption is rebuttable. *Id.* This court ruled that although the husband utilized the proceeds from the sale of his inherited stock to pay off the debt on the disputed property, because he took title with his wife as joint tenants, it was appropriate to presume that he intended a gift to his wife of a one-half interest in the property. This court found no testimony or evidence in the record to rebut the presumption and, accordingly, held that the trial court did not abuse its discretion in including the property in the marital estate.

In the present case, Pat contributed approximately $10,000 of her premarital savings as a downpayment on the purchase of the parties' first house, which was later sold, and the proceeds used to improve or remodel the house ultimately purchased by Dan's corporation, Longhorn Farms. While the evidence presented at trial did not reveal whether the parties' first home was titled jointly, it is clear that the home which Pat claims was improved by the proceeds from the sale of the first home is titled in Longhorn Farms, which although Pat has no ownership interest in, was included in the marital estate. We find that the record does not contain evidence to rebut the presumption that Pat made a gift to the marriage by contributing the $10,000 to the parties' home. Accordingly, we find that it was error to give Pat credit for this portion of her premarital savings.

As to the remaining amount of premarital savings of approximately $27,000, the only evidence presented by Pat is her testimony that she was required to spend approximately $17,000 between the time when the parties separated in November 1996 and when she filed for divorce in September 1998. The Nebraska Supreme Court recently considered, in *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000), a dispute concerning assets that the parties acquired during their marriage which the husband claimed he spent or otherwise disposed of following the parties' separation of slightly over 2 years before the husband filed for divorce. The wife claimed that the husband did not adequately account for either the proceeds from a retirement account or a real estate sale. The trial court ruled that marital assets liquidated by the husband following the parties' sep-

aration did not have to be accounted for due to the nearly 5-year lapse of time between the parties' separation and the retrial following an initial appeal. The Nebraska Supreme Court ruled that the trial court abused its discretion in not including the retirement account funds or real estate sale proceeds in the marital estate as the husband had not properly accounted for them. The court reasoned that without substantiation by receipts, canceled checks, or other evidence, the testimony of a party that he or she spent or otherwise disposed of marital assets is not sufficient to support such allegation. *Brunges v. Brunges, supra.*

In the present case, although we are considering the disposal of funds alleged to be premarital assets, the same logic as that used in *Brunges* should be applied. In *Brunges v. Brunges, supra*, the husband did not properly account for the funds he sought to have excluded from the marital estate, and the same problem is present here. Pat has provided no substantiation to account for how she spent or otherwise disposed of the premarital savings account. Pat asserts that if she is not given a credit for premarital savings because she no longer has them in her possession, then Dan would essentially be rewarded for not providing Pat and the parties' children sufficient funds to live on while Pat was attempting to reconcile the marriage. As much as we might agree with Pat's position, if there was evidence in the record to establish her assertion as to how the money was spent, we cannot ignore the fact that she has not met her burden of proof with respect to this portion of her alleged $50,000 in premarital savings. Accordingly, we find that the district court abused its discretion in allowing Pat the full $50,000 premarital credit and further find that the correct amount of premarital credit to be given to Pat is $13,000.

## VI. CONCLUSION

We conclude that the trial court did err in including the deferred income from 1998 in the computation of Dan's earning capacity for purposes of setting child support and find that Dan's child support obligation should be modified based upon his average net monthly income as follows: $2,154 for four children, $1,988 for three children, $1,661 for two children, and $1,140 for one child.

We further conclude that the trial court erred in awarding Pat a $50,000 premarital credit and modify that portion of the order to award Pat a premarital credit of $13,000. We affirm the trial court's division and equalization of the marital estate, with the exception of the amount of judgment awarded to Pat, which should be modified to $216,240 in light of the reduction in amount of premarital credit set forth above. We affirm the trial court's award of alimony to Pat.

AFFIRMED AS MODIFIED.

HANNON, Judge, dissenting.

I respectfully dissent from that portion of the opinion which decreases the amount of the credit that Pat is to receive for the $50,000 she brought into the marriage. In my view, the majority is basing its decision upon the trial court's inability to trace that portion of the $50,000 she brought into the marriage, and the opinion allows credit for only the $13,000 which can be traced. It has always been my understanding that credit may be given for property brought into the marriage even though the property loses its identity in the marital estate. The Nebraska Supreme Court has stated:

> Equitable property division under § 42-365 is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

*Heald v. Heald*, 259 Neb. 604, 612, 611 N.W.2d 598, 605 (2000).

I think the cases cited in the opinion to support denying Pat credit, such as *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997); *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988); *Frost v. Frost*, 227 Neb. 414, 418 N.W.2d 220 (1988); and *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985), have to do with the first step, that is, the determination of the parties' marital and nonmarital property. "Tracing" has to do with the determination of whether specific property is subject to treatment as nonmarital property, and cases such as *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997); *Van Newkirk v. Van Newkirk*, 212

Neb. 730, 325 N.W.2d 832 (1982); and *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996), have to do with special situations where for one reason or another property was considered marital property even though the evidence showed that it could be traced as property brought into the marriage by one party. Notwithstanding these rules, I think that in dividing the marital estate, the trial court can give a party credit for property that he or she brought into the marriage, even when such property has lost its identity as nonmarital property. I think this process is part of the third step referred to in *Heald v. Heald, supra.*

I have always understood the portion of § 42-365 directing the court to consider the history of the contribution of each party to the marriage when dividing marital property to include a consideration of the financial contribution the parties might have made to the marriage by way of bringing property into the marital estate. This approach is longstanding. In *Francil v. Francil*, 153 Neb. 243, 44 N.W.2d 315 (1950), the court noted that the husband and wife had separately inherited $4,000 and $2,000, respectively, which they had both "contributed to the estate." The court concluded that an equal division of property was justified, but awarded the husband a 40-acre tract of marital property which represented the greater amount put into the estate by the husband.

In *Heald v. Heald, supra*, the trial court did not give the husband credit for a $5,380 downpayment he made on the parties' first marital home, which was originally purchased by him before the marriage in his name, but was later placed in joint tenancy with his wife. The trial court did not give credit for the downpayment because the husband had placed the property in joint tenancy. Upon appeal, the husband was given credit for the downpayment. The court's opinion states that the first marital home was replaced when the parties moved from Ralston, Nebraska, to Plattsmouth, Nebraska, but does not state whether the first marital home was sold or retained, only that a new marital home was acquired. In my opinion, *Heald* is recent authority for the proposition that when dividing the marital estate, credit may, and maybe should, be given for property contributed to the marital estate. I believe the case held that it was error not to give the credit.

The practice of giving credit for property brought into the marriage is longstanding. In *Johnson v. Johnson*, 209 Neb 317, 307 N.W.2d 783 (1981), certain bonds which the husband owned at the time of the marriage were later transferred to both spouses' names, and then the funds were used to build a home and a Quonset building and to buy machinery. The value of the bonds were "set off" to the husband in dividing the property. The action was affirmed, and in so doing, the court stated that the wife had failed to recognize that the bonds which were placed in her name were cashed and the funds used. In *Johnson*, the husband was also awarded certain real estate which had come to him by way of gifts of cash from his mother. The cash was used to purchase real estate from the mother, which real estate was then deeded to both parties. The court stated:

> The trial court, in making its determination relating to the property division, was entitled to consider the fact that Sharon contributed nothing to the acquisition of these properties and that the source of the funds used to acquire the farms were gifts from John's mother. In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held.

*Id.* at 324, 307 N.W.2d at 788.

Nebraska Supreme Court cases frequently give parties credit for untraced property brought into the marriage. For instance, in *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985), frequently cited for its statement on tracing, the trial court gave the wife $17,400 credit for property brought into the marriage. On appeal, it was noted that this figure gave her credit for the $10,000 value of an insurance policy she brought into the marriage, but the credit was ultimately found to be error because she had also been awarded that insurance policy. My point being that she received a $7,400 credit for other property brought into the marriage without comment and that credit for the value of the insurance policy was only disallowed for the stated reason that to give her both the policy and credit for its value was a duplication. While the *Rezac* court did not allow the husband to trace certain premarital property that had been sold and reinvested during the marriage, the division of the marital estate

gave the husband 60 percent of the marital estate after allowance for the property the wife brought into the marriage.

It appears to me that in dividing the marital estate, the trial court can give the parties the benefit of their respective financial contributions to the marital estate either by giving them credit when computing the value of the property distributed to them or by crediting them the value of the property brought into the marriage. The credit is usually for the value of the property when the property was brought into the marriage or, if it was later sold or transferred, for the amount realized upon the sale or transfer. However, I think the party with the greatest financial contribution is frequently given a greater share of the marital property with the larger contribution in mind. The approach used in a given case depends upon the situation of the parties at the time of the dissolution. In the case at hand, I do not think the trial court abused its discretion in giving Pat credit in the manner that it did.

In *Ragains v. Ragains*, 204 Neb. 50, 281 N.W.2d 516 (1979), the trial court made an allowance to the husband of $75,460 for an inheritance, gifts he had received, and property that he had owned prior to marriage. The balance of the assets was divided $138,481.75 to the husband and $126,713.72 to the wife, and the wife received $36,000 in alimony. The wife assigned the credit as error and argued that the decree awarded her husband 62.8 percent of the property and gave her only 37.2 percent. The court stated that if alimony was considered, the husband received 52 percent of the property and the wife received 48 percent, and affirmed the trial court's award.

In *Ward v. Ward*, 7 Neb. App. 821, 585 N.W.2d 551 (1998), the trial court had not listed and valued the assets, and therefore as part of our review, this court listed and valued the marital estate property and the marital debts, and then divided the property equally after allowing each party credit for property he or she brought into the marriage. We awarded the husband $43,303 of credit for the value of a house and savings he brought into the marriage, less the debts he brought with him, and gave the wife $3,329 credit for the proceeds of the sale of her nonmarital car, which were used to purchase the parties' home. I believe that approach has been quite common and usually goes undisputed or unmentioned.

In the case at hand, the evidence shows that Pat spent $17,000 on living expenses while the parties were separated. It also shows that she and Dan separated in November 1996 and that the divorce petition was not filed until September 1998. Pat and the children lived in the Upland home only until December 1997. During the separation, Dan gave her $1,342 per month for support and paid himself $1,002 per month in salary. After the divorce petition was filed, Dan paid Pat $2,139 per month child support and $1,000 per month alimony. Dan moved back in the Upland home in October 1998, and of course, he had access to the family money from the time of separation. I think this situation justifies the conclusion that Pat needed to spend the money in her possession to support herself and the children while Dan had control of the remainder of the family wealth. He undoubtedly lived upon the family wealth without accounting to her for it. I think the trial court, in its discretion, was correct in awarding Pat credit for the entire $50,000 she brought into the marriage. I would affirm that portion of the trial court's property division which gave Pat credit for property she brought into the marriage, because I do not believe the credit given was an abuse of discretion.