ROSE MARY OLSON, APPELLANT AND CROSS-APPELLEE,
v. DALE F. OLSON, APPELLEE AND CROSS-APPELLANT.

693 N.W.2d 572

Filed March 1, 2005.   No. A-03-877.

John A. Wolf, of Shamberg, Wolf, McDermott & Depue, for appellant.

Kent A. Schroeder, of Ross, Schroeder & Romatzke, for appellee.

SIEVERS, MOORE, and CASSEL, Judges.

SIEVERS, Judge.

Rose Mary Olson appeals the decree of the district court for Clay County which dissolved her marriage to Dale F. Olson, and Dale cross-appeals. The economic aspects of the case are complicated, because the Olsons are an elderly couple who transferred

to a family corporation all of the rather substantial farm assets the Olsons accumulated and then gifted to their children a majority of such corporation's stock, all of which actions occurred many years ago.

## FACTUAL AND PROCEDURAL BACKGROUND

Rose Mary and Dale were married on June 17, 1955, in Nebraska City, Nebraska. During the marriage, three children were born: Diane, Dean, and Darcy. Rose Mary also had two children from a previous marriage: John and Judy. There are no minor children remaining from the marriage—the youngest child is now in her late thirties.

Dale owned some farmland prior to the marriage. Dale owned 80 acres jointly with his mother, and because of the right of survivorship, Dale became the sole owner of that land upon his mother's death in the early 1960's. Additionally, Dale and his mother each owned an undivided one-half interest in another 395.1 acres, and Dale inherited his mother's one-half interest upon her death. Therefore, we simplify and summarize as follows: Dale owned 237.55 acres of farmland before the marriage and later acquired another 237.55 acres as a result of his mother's death (40 acres by right of survivorship and 197.55 acres by inheritance under the provisions of his mother's will).

In 1982 for estate planning purposes, Dale and Rose Mary established Olson Land & Cattle Co., Inc., a family corporation. Dale and Rose Mary put all of their marital assets (house, land, personal property, et cetera) into the corporation, and Dale also put all of his premarital and inherited assets into the corporation. From the time the corporation was formed in 1982, Rose Mary has always been the secretary-treasurer; Dale was president and Dean was vice president from 1982 until sometime in the late 1980's, when Dale became the vice president and Dean became the president.

When the corporation was established, two types of stock were issued: 1,000 shares of Class A voting stock and 2,000 shares of Class B nonvoting stock. All 1,000 shares of the Class A stock and 1,700 shares of the Class B stock were in Dale's name alone. The other 300 shares of Class B stock were held jointly by Dale and Rose Mary. Between 1982 and 1989, several gifts of stock were

made to the parties' three children. As a result, the current stock ownership is as follows: Dale owns 501 shares of Class A stock, Dean owns 499 shares of Class A stock, Dale and Rose Mary still jointly own 300 shares of Class B stock, Diane and Darcy each own 724 shares of Class B stock, Dean owns 225 shares of Class B stock, and Dale owns 27 shares of Class B stock. The current stock ownership, where the children own 72.4 percent of the outstanding stock, has been in place since 1989. No dividends have ever been paid to any stockholder.

At the time of trial, Dale had three sources of income. He received a salary of $6,000 per year from the corporation, $6,000 per year cash rent from Dean for Dale's one-half interest in their jointly owned 160 acres, and $1,199 per month in Social Security benefits. At the time of trial, Rose Mary received $576 per month in Social Security benefits and $125 per month from an annuity. Before the separation, Dale and Rose Mary did not have a substantial income. But they did not need a lot of money for living expenses because the corporation provided them with a house, paid their utilities, provided Dale with a company truck, and paid for expenses related to the truck.

On September 22, 2001, a tornado destroyed the farmstead where Dale and Rose Mary lived, as well as their personal belongings. As it turned out, the corporation, which held title to all of the assets, did not have adequate insurance. Four days after the tornado, Dale and Rose Mary moved into a condominium in Shickley, Nebraska. Rose Mary purchased new furniture for the condominium and clothing for herself and Dale, charging the purchases to her credit card. Less than 2 weeks after moving into the condominium, Rose Mary left Dale. She spent 3 months with her daughter Darcy in Arizona, spent 2 months with her son John in Nevada, and then moved into an apartment in Clay Center, Nebraska. She purchased more new furniture and some appliances for her apartment, again charging the purchases to her credit card. Rose Mary testified she left Dale after she realized that everything they had was owned by the corporation and that nothing was titled in her name. Rose Mary testified that all of the insurance money went to the corporation and that she could not get any of the checks.

Rose Mary filed her petition for divorce on October 9, 2001. On October 29, the trial court filed a journal entry ordering Dale to pay Rose Mary temporary alimony in the amount of $4,000 per month. The trial court also ordered Dale to pay $26,850 in temporary fees for attorney fees, real estate and personal property appraisers' fees, certified public accountant fees, court reporter fees, filing fees, and court costs. In a journal entry filed on November 27, the trial court vacated its orders set forth in the October 29 journal entry. In a new journal entry filed on December 5, the court awarded Rose Mary temporary alimony in the amount of $2,000 per month and awarded her $23,215.16 from a checking account from which she could apply $18,103 toward the same fees and costs previously listed in the October 29 journal entry. The remaining $5,112.16 from the checking account was to be applied to the temporary alimony payments. Dale's first out-of-pocket temporary alimony payment was due January 2002, when the checking account balance was exhausted. Thus, $5,112.16 of the checking account was used to pay the November and December 2001 temporary alimony of $2,000 per month and $1,112.16 toward the alimony for January 2002.

Trial was held on March 12, 2003, and the decree of dissolution was filed on May 15. In its decree, the trial court ordered that Dale should receive a credit of $147,600 for his premarital assets. The trial court valued the Olson Land & Cattle Co. stock at $650 per share, and the parties owned 828 shares for a total value of $538,200. The trial court awarded 365 shares of Class A stock to Rose Mary at a value of $237,250 and the balance of the stock to Dale. The court gave Dale the option to buy Rose Mary's stock over a 10-year period. If Dale were to elect to purchase Rose Mary's stock, he was to notify her in writing within 30 days of the finality of the court's decree and to pay it in 10 yearly installments, with interest at 3.114 percent per annum. The trial court did not award either party alimony, citing the circumstances of the parties and Dale's financial inability to pay alimony. However, the trial court did find that the circumstances of the parties dictated an even division of the property, and the court divided the remaining marital property between Dale and Rose Mary and stated that each was responsible for all individual debts incurred since their

separation. We reproduce the trial court's worksheet on which it showed its division of property as follows:

|  | Assets | |
|---|---|---|
|  | Husband | Wife |
| Household furnishings and equipment | $      329.00 | $  12,262.00 |
| Checking and savings | 11,689.68 | 42,124.93 |
| Automobile | 0.00 | 20,000.00 |
| Real estate | 146,000.00 | 0.00 |
| Stocks | 300,950.00 | 237,250.00 |
| Total assets | $458,968.68 | $311,636.93 |
|  | Liabilities | |
| Mortgages | $      0.00 | $      0.00 |
| Secured creditors | 0.00 | 0.00 |
| Unsecured creditors | 0.00 | 0.00 |
| Premarital assets | 147,600.00 | 0.00 |
| Total to each party | $311,368.68 | $311,636.93 |

While the trial court's worksheet lists Dale's "premarital assets" as a "liability," perhaps an inaccurate characterization, we surmise from the worksheet that the trial court intended that each spouse would receive half of the marital estate which the court figured at approximately $311,000. Additionally, Dale would receive $147,600 as his separate property. Given the length of the marriage and the other circumstances, we certainly agree that an equal division of the marital estate is warranted, and no contention to the contrary is advanced by either party.

Rose Mary's motion for new trial was overruled on June 27, 2003. On August 21, the trial court filed a journal entry in which Dale was ordered to pay Rose Mary $2,000 per month for spousal support pending appeal. Rose Mary appeals the trial court's decision, and Dale cross-appeals.

## ASSIGNMENTS OF ERROR

Rose Mary alleges, restated, that the district court erred (1) in failing to award her alimony; (2) in finding that Dale's premarital assets were excluded from the parties' marital estate; (3) in determining the value of Dale's premarital assets; (4) in not awarding,

as part of her share of the marital estate, assets of or stock in Olson Land & Cattle Co.; and (5) in failing to include in the marital estate stock which Dale transferred to his children and in failing to credit the value of the transferred property to Dale's share of the marital estate.

On cross-appeal, Dale alleges that the district court erred in (1) awarding temporary alimony when the application therefor was not accompanied by a statement of Rose Mary's financial condition as well as the other requirements set forth in Neb. Rev. Stat. § 42-359 (Reissue 2004); (2) awarding temporary attorney fees, a real estate appraiser fee, the cost of a certified public accountant, and miscellaneous costs of litigation when the same was not supported by any evidence, contrary to Neb. Rev. Stat. § 42-367 (Reissue 2004); (3) awarding temporary alimony pending appeal when the evidence supporting such an award demonstrated that there were insufficient funds available to make such a payment; (4) determining the value of the corporate stock when the court failed to take into consideration the outstanding corporate debt; and (5) failing to find § 42-367 unconstitutional.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Bauerle v. Bauerle*, 263 Neb. 881, 644 N.W.2d 128 (2002).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Crawford v. Crawford*, 263 Neb. 37, 638 N.W.2d 505 (2002).

## ANALYSIS

*Dale's Premarital and Separate Assets.*

Rose Mary argues that the district court erred in excluding Dale's premarital assets from the parties' marital estate and in determining the value of Dale's premarital assets. "Property owned by a party at the time of marriage is not marital property." *Smith v. Smith*, 9 Neb. App. 975, 982, 623 N.W.2d 705, 712 (2001). "With respect to separate property, whether inherited, gifted, or premarital, if it can be identified, it is typically set off to the inheriting spouse, the spouse donee of the gift, or the spouse who brought the property into the marriage." *Id.* "An exception to the rule applies where . . . the spouse not owning the property prior to the marriage . . . has significantly cared for the property during the marriage." *Tyler v. Tyler*, 253 Neb. 209, 213, 570 N.W.2d 317, 319 (1997). See, also, *Applegate v. Applegate*, 219 Neb. 532, 365 N.W.2d 394 (1985) (wife's contributions to operation of property were typical of wife of farmer-cattle raiser, and though not to be minimized, such efforts did not contribute directly to any preservation of or increase in value of nonmarital property such that it should be included in marital estate). The burden of proof to show that property is a nonmarital asset remains with the person making the claim. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). See *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

Dale has shown that the 80 acres he owned jointly with his mother was a nonmarital asset. This 80 acres was purchased for $6,000 by Dale and his mother as joint tenants, as evidenced by a warranty deed filed on February 7, 1951, well before Dale and Rose Mary's marriage. Dale has also shown that the other 395.1 acres is a nonmarital asset. The record shows that that property was one-half premarital and one-half inherited. The final decree regarding the will of Dale's mother shows that she left her undivided one-half interest in such property to Dale. We emphasize that at this point in our analysis, our finding is limited to the fact that prior to formation of the corporation and the transfer of these lands to it, the land was Dale's separate property. We also now note that Rose Mary introduced no evidence to bring either of these lands within the exception to the general rule that separate property is to be set aside. See, e.g., *Tyler, supra*; *Applegate,*

*supra.* The trial court stated in the dissolution decree that Dale "brought land, cattle, and equipment into the marriage that was later transferred to the corporation . . . and that [Dale] should receive a credit of $147,600.00 for those assets . . . as premarital property."

The first difficulty we face is understanding how the trial court arrived at the figure of $147,600, because neither the decree nor the record contains any reasoning or rationale of the court for that figure. However, we initially conclude that said figure has to relate solely to the land discussed above rather than to any cattle and equipment Dale owned before he married Rose Mary. This is so because there is no evidence that the cattle and equipment which Dale, an individual, brought into the marriage in 1955 can be "identified" as being related in any way to any cattle or equipment which the corporation now owns nearly 50 years later. Therefore, we determine that the figure of $147,600 can only be derived from the land, a conclusion supported by our study of the record, as we shall attempt to explain below.

Our close study of the record reveals that the sum of $147,600 probably derives from the appraiser's valuation of $513,000 for all of Dale's separately owned land. Of the entire 3,000 issued corporate shares, at the time of the trial, 828 shares, or 27.6 percent, remained in the hands of Rose Mary and Dale and was ungifted to their children. Thus, if one takes 27.6 percent of $513,000, the result is very close to the trial court's figure for Dale's credit of $147,600. It is "close" because 27.6 percent of $513,000 actually is $141,588, which is $6,012 less than the trial court set off to Dale as his separate property. Therefore, either we have correctly discerned the trial court's methodology by which it arrived at the figure of $147,600, which includes a mathematical error of $6,012 by the trial court, or the trial court used some other method which we cannot discern from the record to arrive at the figure of $147,600. However, we believe the first choice is far more likely, because considerable "playing" with the numbers does not produce any figure remotely resembling $147,600.

Remembering that the record shows that the gifts of stock to the children of the marriage were made at different times and in differing amounts of stock, the methodology we attribute to the trial court is flawed in several of its inherent assumptions. The method

assumes regardless of when a gift of stock was made, or which particular gift, to which child: (1) each gifted share represented a "piece" of Dale's separately owned land which was consistently proportional to the marital property, and the corporation's after-acquired property throughout the entire process of gifting to the children, and (2) the appraiser's 2003 value of $513,000 for Dale's separate land was an appropriate value to use for the "piece" of land which was being gifted despite the fact the gifts were made at different times, all of which were long before 2003. But there is no evidence in the record whatsoever to support these assumptions implicit in the methodology we attribute to the trial court. We regret that our attribution of a methodology to the trial court could be incorrect, but we do not have findings of fact to guide appellate review, and such would clearly be helpful to us in this unique case. That said, we emphasize that in our judgment, figuring out the trial court's methodology, and articulating what we see as its flaws in that methodology, is important because doing so helps frame the proper resolution of this issue.

*Identity of Dale's Separate Property.*

Summarized, Rose Mary's argument is that the transfer of Dale's separately owned property to the corporation causes such property to lose its "identity" as separate property and that the trial court therefore erred in awarding Dale a credit of $147,600 for nonmarital property, because it did not treat all of the remaining ungifted shares of Olson Land & Cattle Co. stock as entirely marital property.

The legal principles which are at the forefront of our analysis were set forth in *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001), where we recognized that it has been a longstanding rule that when awarding property in a dissolution of marriage, property acquired by one of the parties through gift or inheritance, which property is readily identifiable and traceable to that party, ordinarily is set off to the individual receiving the inheritance or gift and is not considered a part of the marital estate. See, also, *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988). In *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985), the Nebraska Supreme Court considered the tracing of premarital property and found that tracing property is generally an unworkable proposition

because the parties have a tendency to suggest tracing only when there is an improvement in value. The *Rezac* court found that it is not error to restrict the credit to the identical property which is retained during the marriage or to the value of the property at the time of the marriage or when disposed of during the marriage. Thus, discerning the trial court's methodology for its credit to Dale is crucial in order to determine if the court used the type of tracing approved in *Rezac, supra.* However, we conclude that the trial court could not have used such tracing, because there was no evidence introduced upon which to base tracing. The appraiser's valuation of $513,000 of the former separately owned land was only for the year 2003, but the land was transferred to the corporation in 1982. Thus, the evidence is clearly insufficient, under *Rezac, supra*, to trace the 1982 value of the separately owned land to the 2003 valuation of the corporate stock.

Additionally, a long-established precept of corporate law prevents a credit for Dale's formerly owned separate property. It has long been held that shares of stock of a corporation in the hands of an individual are a distinct entity from the property of the corporation. *Peter Kiewit Sons' Co. v. County of Douglas*, 161 Neb. 93, 72 N.W.2d 415 (1955). See *Allied Contractors, Inc., v. Board of Equalization*, 113 Neb. 627, 204 N.W. 374 (1925). The cases cited involve taxation of property, and thus, we do not detail them, but the predicate holding about the nature of corporate stock is applicable here. Dale separately owned farmland, which was conveyed to Olson Land & Cattle Co. in exchange for stock. That stock is different property than the land. The proposition which necessarily underlies the district court's decision is that the corporate stock automatically equates to the land. But that notion is incorrect, absent very particularized evidence which is not present in this record. After the transfer, the land was then owned by a different legal entity—the corporation—and Dale and Rose Mary then owned something entirely different—shares of corporate stock. The district court apparently treated the separately owned land and the stock as interchangeable, when the general rule is that they are not. Moreover, there was no evidence introduced which would create an exception to this general rule.

As stated earlier, the burden is on Dale to prove his claim that there is nonmarital property which should be set off to him. See

*Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999). The evidence was that all of the property which Dale owned before the marriage and which he acquired as a result of his mother's death was transferred to the corporation upon its formation in 1982. By the time of the divorce in 2003, the parties still owned 828 shares of stock, but Dale introduced no evidence, which of necessity would have to have been created at the time of the transfer in 1982, that some or all of those 828 shares directly represented or could be attributed to the separately owned land. In other words, Dale did not prove that the separately owned land, to the exclusion of other land and cattle and equipment transferred in 1982, can be traced to all or part of these 828 shares of stock. There was no evidence that any particular stock certificate or class of stock, Class A for example, was created in exchange for a particular asset, such as the cattle, the separately owned land, or the land acquired by purchase after the marriage. To illustrate, if in 1982, the separately owned land was transferred to the corporation in exchange for a specific class of stock (for example, Class X stock) or a specific stock certificate, and neither of these had been gifted to the Olsons' children at the time of the divorce, it would be possible to identify and trace the separately owned land to the stock and set it, or its value, off to Dale. Thus, because there is no proof of identity, nor particularized evidence to enable tracing of the land separately owned by Dale in 1982 to the remaining stock owned by the Olsons in 2003, the trial court erred in setting aside to Dale the sum of $147,600, which amount we have concluded was intended to represent the land Dale separately owned in 1982. We will discuss in detail later how this conclusion impacts the distribution of the marital estate.

*Validity of Transfer of Stock to Children.*

Rose Mary argues that the trial court failed to include in the marital estate stock which Dale transferred to his children and that the trial court failed to credit the value of the transferred property to Dale's share of the marital estate. We begin by noting that the stock was not transferred to Dale's children, but, rather, to Dale and Rose Mary's children. The stock transfers occurred between 1982 and 1989. Rose Mary admitted during trial that the purpose of the corporation was for estate planning purposes to eventually

give the corporation to the children. Furthermore, at trial, Rose Mary acknowledged that for 5 years, she signed the papers for the stock transfers to the children. Because the stock was transferred by both parties to the children during the marriage, such transferred stock was no longer part of the marital estate. Therefore, the trial court did not abuse its discretion in failing to include the gifted stock as part of the marital estate or in failing to credit the value of the transferred stock to Dale's share of the marital estate. This assignment is without merit.

*Valuation of Corporate Stock.*

Dale argues that the trial court's valuation of the stock is too high because the trial court ignored the evidence of the corporation's operating loan, and the appraiser's valuation likewise ignored such fact. The rule is that "we will affirm a trial court's valuation of a closely held corporation if we find that such method of valuation used has an 'acceptable basis in fact and principle.' " *Bryan v. Bryan*, 222 Neb. 180, 185, 382 N.W.2d 603, 606 (1986).

The corporation's land was appraised at $1,600,000. Furthermore, Dale testified that the corporation had machinery worth $200,000 and approximately 300 head of cattle worth $500 each, or $150,000. Therefore, the total value of the land, machinery, and cattle is $1,950,000. From that value, the trial court determined that the corporation's stock was worth $650 per share ($1,950,000 ÷ 3,000 shares = $650 per share).

Dale argues that the trial court overvalued the corporate stock because, as Dean testified, the corporation has an outstanding operating note of $130,000. Dale argues that the true book value of the corporate stock is $606.67 per share ($1,950,000 − $130,000 = $1,820,000 ÷ 3,000 shares = $606.67 per share). However, other than Dean's testimony, there is no evidence in the record showing that the corporation has an outstanding operating note, and when Dean's testimony is studied carefully, it becomes apparent that the corporation's operating loan was paid off each year when cattle and crops were sold. Dean agreed that this was "seed money," and the record shows that the valuation of the corporation did not include any value for growing crops—a corporate asset produced by the operating loan. In addition, the corporation's yearly tax returns do not show any debts due in more than a year after each

return. Finally, Dean agreed that the loan was a "wash" when the fact that land and cattle were routinely sold to pay off the loan was considered. Given the totality of the evidence regarding the operating loan, we cannot say that the trial court abused its discretion in valuing the corporate stock without regard to the corporation's short-term operating loan. This assignment is without merit.

■■■ Rose Mary assigns that the trial court erred in not awarding to her a part of the assets of or stock in Olson Land & Cattle Co. While she makes such assignment, she did not specifically argue such in her brief. "Alleged errors must be specifically assigned and specifically argued in order to be considered by an appellate court." *Schnell v. Schnell*, 12 Neb. App. 321, 323, 673 N.W.2d 578, 582 (2003). Furthermore, we note that Rose Mary was awarded 365 shares of Class A stock, though the trial court did give Dale the option of buying those shares back from Rose Mary. This assignment is without merit.

*Alimony.*

■■■ Rose Mary argues that the trial court erred in failing to award her alimony. The applicable considerations for alimony awards are as follows:

> "When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party."

*Bauerle v. Bauerle*, 263 Neb. 881, 888, 644 N.W.2d 128, 135 (2002). Accord Neb. Rev. Stat. § 42-365 (Reissue 1998).

This divorce case is rather unusual for a number of reasons. The parties were married for almost 48 years, and at the time of trial, Rose Mary was 77 years old and Dale was 80 years old. During the marriage, Dale farmed and Rose Mary took care of the house and children. Everything of consequence that Dale and Rose Mary owned was given to the corporation over 20 years ago, and the corporation paid most of their expenses. Dale is retired

and has limited retirement income. While Dale and Rose Mary's estate planning may have been perfectly sound in 1982, such plan makes for a difficult economic situation when a divorce occurs this late in life—after nearly three-fourths of their major asset and source of livelihood, stock in a family corporation, has been gifted to the children of the marriage. Given Dale's age, his limited income, and the circumstances of the parties, the trial court did not abuse its discretion in not awarding Rose Mary alimony. The trial court found that "[Dale] does not have sufficient income to pay [Rose Mary] alimony and still survive financially on his own" and that he "does not have the financial base or income to pay alimony." These findings are wholly supported by the record.

### Support Payments Pending Appeal.

However, as Dale assigns as error, the trial court did abuse its discretion in awarding Rose Mary support or alimony of $2,000 per month during the pendency of this appeal. Clearly, everything the trial court said about not awarding alimony applies with equal force to Rose Mary's request for support payments during the appeal. To hold otherwise would have the effect of granting Rose Mary approximately 18 months of alimony, despite the court's finding that it "does not view this as an alimony case." To uphold the award of support during the appeal and affirm the denial of alimony is inherently illogical. In other words, the trial court either correctly decided the alimony question or did not. If the court was correct in denying alimony, as we have concluded, then it was correct at the time of its decree, not just at the time our opinion is released. That said, we recognize that any support paid pending this appeal has likely already been spent. Therefore, given Rose Mary's "cash poor" posture, the only practical way to balance the books is to adjust the award of stock to Rose Mary. Thus, the resolution section of this opinion reflects such adjustment.

### Award of Temporary Alimony.

Dale also contends that the trial court erred in ordering him to pay Rose Mary temporary alimony prior to trial, because Rose Mary's application for such did not include a financial statement pursuant to § 42-359, which states in part: "Applications for support or alimony shall be accompanied by a statement of the applicant's financial condition and, to the best of the applicant's

knowledge, a statement of the other party's financial condition." This is a spurious assignment of error.

The trial court initially awarded Rose Mary temporary alimony of $4,000 per month on October 29, 2001. On November 8, Dale filed a motion to quash that award, and therein raised the matter of § 42-359. On November 27, the trial court vacated the earlier award. A second telephonic hearing on the matter was held on November 29, at which time Rose Mary's affidavit was presented. While that affidavit does not contain every detail about the parties' economic positions and some of Rose Mary's suppositions about Dale's income were later discredited, two facts are significant. An affidavit of Rose Mary's financial condition was in fact filed, and there is no bill of exceptions from the November 29 hearing, meaning that we do not know what was said or what objections were made. Only one case has ever discussed this statute, *Danielson v. Danielson*, 204 Neb. 776, 285 N.W.2d 494 (1979), which case involved an application to modify child support. The *Danielson* court clearly indicated that a timely objection to the lack of a § 42-359 affidavit was required. But Dale has not provided us with any record showing that he made any objection at the November 29 hearing, which, as it turns out, is the hearing which matters. The record contains an affidavit, but no objection. Thus, as said, this assignment of error is spurious.

*Other Temporary Costs.*

Dale argues that the district court erred in awarding Rose Mary a total of $18,103 in temporary fees—$10,000 for attorney fees, $3,500 for a real estate appraiser's fee, $3,500 for a certified public accountant's fee, and $1,103 for miscellaneous costs of litigation. Dale argues that such award constituted an abuse of discretion by the court because (1) $6,334.20 of the amount for attorney fees was still in the attorney's trust account at the time of trial, (2) the real estate appraisal cost only $1,500, (3) an accountant was not employed, and (4) only one deposition was taken, at a cost of $268.80. "The allowance of attorney fees and costs in a dissolution of marriage case is discretionary with the trial court and depends upon a review of all the facts and circumstances presented." *Hafer v. Hafer*, 3 Neb. App. 129, 141, 524 N.W.2d 65, 73 (1994). "If there is no abuse of discretion, the decision of the trial

court should be affirmed." *Id*. The same principles and standards also apply to appraisal expenses. See *id*.

While Dale makes the argument that not all of the funds were expended, he has not provided us with a record to establish such. Dale argues that Rose Mary's attorney has $6,334.20 remaining in his trust account. However, the trial court did not award attorney fees in the decree, and Rose Mary does not contend that such failure was error. We think the reasonable inferences are that Rose Mary's counsel had not completed billing at the time of trial and that the trial court thought the $10,000 attorney fee was adequate. While the trial court may have anticipated more litigation expenses than were incurred, we do not see any abuse of discretion. This is particularly true when we remember that the trial court made this award by giving Rose Mary a checking account which would have had to have been accounted for and divided anyway. Therefore, because division of property does not need to be mathematically perfect, the fact that Rose Mary may have ended up with several thousand dollars of unspent litigation expenses does not establish that the trial court abused its discretion in making these temporary allowances. This assignment is without merit.

*Constitutionality of § 42-367.*

"This court cannot determine the constitutionality of a statute, yet when necessary to a decision in the case before us, we do have jurisdiction to determine whether a constitutional question has been properly raised." *State v. Johnson*, 12 Neb. App. 247, 252-53, 670 N.W.2d 802, 809 (2003). Accord *Harvey v. Harvey*, 6 Neb. App. 524, 575 N.W.2d 167 (1998). The Nebraska Supreme Court insists upon strict compliance with Neb. Ct. R. of Prac. 9E (rev. 2000) before it will consider a constitutional challenge. See *Harvey, supra*. Rule 9E requires that a party presenting a case involving the federal or state constitutionality of a statute must file and serve a separate written notice thereof with the Supreme Court Clerk at the time of filing such party's brief. Additionally, if a statute is alleged to be unconstitutional, the Attorney General must be served with a copy of the proceeding. Neb. Rev. Stat. § 25-21,159 (Cum. Supp. 2004). See, also, *DeCoste v. City of Wahoo*, 248 Neb. 463, 534 N.W.2d 760 (1995). The record before us fails to show

that the Attorney General was served with a copy of the proceeding. Therefore, Dale's claim that § 42-367 is unconstitutional has not been properly preserved for appellate review.

### RESOLUTION

#### Trial Court's Division of Assets

| | Husband | Wife |
|---|---|---|
| Household furnishings and equipment | $ 329.00 | $ 12,262.00 |
| Checking and savings | 11,689.68 | 42,124.93 |
| Automobile | 0.00 | 20,000.00 |
| Real estate | 146,000.00 | 0.00 |
| Stocks | 300,950.00 | 237,250.00 |
| Total assets | $458,968.68 | $311,636.93 |

#### Division of Property Upon Appeal
#### Marital Assets

| | |
|---|---|
| Household furnishings and equipment | $ 12,591.00 |
| Checking and savings | 53,814.62 |
| Automobile | 20,000.00 |
| Real estate | 146,000.00 |
| Olson Land & Cattle Co. stock | 538,200.00 |
| Total value of marital estate | $770,605.62 |
| | |
| One-half of marital estate to each | $385,302.81 |

Therefore, to equally divide the marital estate, it is necessary that Rose Mary receive another $73,660 of property which can only be stock. The stock is worth $650 per share under the trial court's findings. Thus, Rose Mary needs to receive an additional 113.333 shares, which we round off to 113 shares for her to receive one-half of the marital estate. However, before modifying its decree, the trial court must first determine the amount of alimony which Rose Mary incorrectly received during the pendency of this appeal. The trial court, by appropriate proceeding, shall ascertain such sum and then reduce the additional 113 shares of stock we have awarded to Rose Mary by the number of shares (rounded to a full share) that equals the amount of temporary alimony paid during this appeal, using the value of $650 per share. The trial court shall then modify its decree to award Rose Mary

that reduced number of additional shares of Olson Land & Cattle Co. Class B stock. Dale's opportunity to buy Rose Mary's shares shall remain unaffected. In all other respects, we affirm the district court's decree of dissolution.

AFFIRMED AS MODIFIED.