ANDREW S. QUINN, APPELLEE, V.
JOYCE E. QUINN, APPELLANT.

689 N.W.2d 605

Filed December 7, 2004. No. A-03-461.

Bernard J. Glaser, Jr., for appellant.

Jeanelle S. Kleveland, of Kleveland Law Offices, for appellee.

IRWIN, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## I. INTRODUCTION

Joyce E. Quinn appeals from the decree dissolving her marriage to Andrew S. Quinn, primarily arguing that the trial court erred in concluding that the parties' jointly titled house in Lincoln, Nebraska, and furniture purchased during the marriage were Andrew's separate property because they had been purchased using proceeds from the sale of a house in Seattle, Washington, which Andrew had purchased, using inherited funds, prior to the marriage and which the parties had renovated during the marriage.

We conclude that the trial court did not abuse its discretion in dividing the property between the parties, and we affirm.

## II. BACKGROUND

Joyce and Andrew were married on April 18, 1998, in Lincoln, Nebraska. No children were born to or adopted by them during the marriage. When they married, the parties lived in Seattle, Washington. They moved to Lincoln in December 2000. The parties separated on December 21, 2001. On December 27, Andrew filed a petition for dissolution of marriage with the Lancaster County District Court. Both parties, as well as two appraisers, testified at the dissolution hearing.

### 1. ANDREW'S TESTIMONY

Andrew testified that in 1993, upon his father's death, he inherited approximately $200,000, amounting to between $160,000 and $170,000 after taxes. The inheritance also included three receivables secured by mortgages, which receivables Andrew described, and to which we will refer, as mortgages. In November 1994, Andrew used a portion of his inheritance to purchase a house in Seattle (Seattle house or Seattle property) for $70,000.

Andrew was unemployed from December 1998 until March 1999 and worked as a metal fabricator from March 1999 through July 2000. Andrew was again unemployed until April 2001. In addition to his wages, during the marriage Andrew utilized funds attributable to his inheritance, income from a rental house stipulated to be Andrew's separate property, payments received on the three mortgages, and an insurance benefit concerning an automobile accident involving his "premarital truck."

The Seattle house underwent extensive renovations both before and after the parties married. Andrew testified that he provided the labor for the vast majority of the renovations and claimed that Joyce painted a bathroom but did little else to renovate the Seattle house. Andrew testified that Joyce made no financial contribution to improvements to the Seattle property and that all contributions toward the Seattle property came from the nonmarital sources identified above.

Andrew asserted that he and Joyce maintained completely separate finances. They maintained separate checking accounts, savings accounts, and credit cards during the marriage, and they

never had a joint financial account of any kind. During all relevant times, Andrew had one checking account, at a credit union in Seattle. In that account, Andrew deposited the income from his inheritance and his wages. Andrew also had a savings account at the credit union. The court received a transaction history report listing transactions in Andrew's checking (draft) account and his savings (share) account from April 1998 to December 2001.

Andrew sold the Seattle property in November 2000 for a gross selling price of $232,500. Andrew testified that he received the sale proceeds through an electronic funds transfer from an escrow account into his checking account. Andrew's credit union transaction history report shows a deposit from "FEDWIRE IN FR PHOENIX SVGS BNK/ESCROW" on November 30, in the amount of $220,344.67.

Andrew stated that when he and Joyce moved to Lincoln, he purchased a house there (Lincoln house or Lincoln property) and closed the sale on January 19, 2001, for $199,500. Andrew testified that he made a $150,000 downpayment on the Lincoln property using the proceeds from the sale of the Seattle property. Andrew's credit union records reflect that on January 19, Andrew made withdrawals totaling $152,277.04. Joyce did not contribute to the downpayment.

Andrew obtained a loan of $50,000 to purchase the Lincoln house, which was secured by a mortgage on the Lincoln property. According to Andrew, because neither of the parties was employed, the mortgage company instructed them to put both of their names on the title. During the "first few months" that they lived at the Lincoln property, Andrew made the payments on the loan using the proceeds from the sale of the Seattle property. Andrew continued to pay the loan installments after the parties' separation, and since purchasing the Lincoln property, Andrew has written all the checks for the loan payments.

Andrew paid for furniture and antiques, valued at $10,250.47, for the Lincoln house. Because Andrew was not working at the time, he purchased all of these furnishings with proceeds from the sale of the Seattle property. He purchased the majority of these items with funds from his checking account, and he purchased "a couple" with a credit card. The trial court received into evidence a list of these items specifying the price of each item

and the number of the check (draft) used for each check purchase. The draft numbers on the list correspond with those in Andrew's credit union transaction history report. Andrew's credit card purchases accounted for $1,826.43 of the $10,250.47 he paid for the furnishings.

Andrew testified that he also used the Seattle house sale proceeds to retire debt he had incurred in renovating the Seattle property. Andrew had replaced the roof of the Seattle house and funded the project with a $5,000 loan from his credit union. Andrew testified that he made monthly payments on the loan using the "proceeds of the loan" before paying the remainder of the loan from proceeds from the sale of the Seattle property. Andrew's transaction history report shows a "TRANS PER LN PYOFF" in the amount of $4,194.21 made on December 4, 2000. Andrew used his credit card to pay for a new furnace in the Seattle house and paid off that debt with the Seattle house sale proceeds. He also obtained a cash advance on his credit card to fund the refinishing of the floors in the Seattle house, and he testified that he paid that debt as well with the Seattle house sale proceeds.

Andrew testified that he made some payments on Joyce's student loans and credit card debts for a period during which Joyce was unemployed.

## 2. JOYCE'S TESTIMONY

Joyce testified that she and Andrew worked on renovating the Seattle house for the first 2 to 2½ years of their marriage. In helping to renovate the house, Joyce did everything Andrew requested. Joyce opined that she and Andrew contributed equally to the renovations of the Seattle house. Although they did not perform the same tasks, she maintained that their contributions had equal value. Joyce testified that she did more than paint a bathroom. She assisted in major projects, such as plumbing, rewiring, and hanging drywall.

Joyce graduated from law school shortly before the parties married and worked as a civil rights investigator while the parties lived in Seattle. She testified that she and Andrew maintained separate checking accounts. Joyce deposited her salary into her checking account; Andrew deposited his salary into his checking account. Joyce had her own credit cards. Although the parties

never had a joint account, Joyce asserted that their money was collectively "our money," that they never made a distinction between his money and her money, and that they had discussed not making such a distinction. She testified that both parties contributed to household expenses.

Joyce explained that the parties had not discussed adding her name as an owner of the Seattle property because they planned to remodel the house, sell it, and move to Lincoln. Joyce did not pay any real estate taxes on the Seattle property but claimed that she paid for some of the renovations to the house from her account. Joyce was not involved in the sale of the Seattle property.

When the parties moved to Lincoln, Andrew made the downpayment on the Lincoln house from his checking account. Joyce admitted that Andrew had deposited all of the proceeds from the Seattle property in that account. All of the payments on the Lincoln house came from Andrew's account, and Joyce admitted that she never contributed any money to that account. Joyce never made any payments on the mortgage debt; nor did she pay any of the real estate taxes or insurance for the Lincoln house from her account.

Joyce and Andrew purchased almost all of the furniture for the Lincoln house after they moved to Lincoln. They shopped together, and Joyce testified that it was assumed that the furniture belonged to both of them. Joyce confirmed that they purchased the furniture with, "for the most part," the proceeds from the Seattle property.

### 3. APPRAISERS' TESTIMONY

James H. Irish, a certified appraiser in Seattle, testified that he appraised the Seattle property and prepared an appraisal report. He had prepared appraisals in Seattle from 1979 to 1985 and from 1992 to the date of trial and was familiar with real estate trends in Seattle. Irish visited the Seattle property several times after the property had been sold, but he did not inspect the interior. He relied on Andrew's representations of the interior improvements made before and after the date of the wedding. In compiling his appraisal, Irish compared the Seattle property to six other homes in the area. Irish appraised the Seattle property in 2002 to determine its value as of April 18, 1998, the date the

parties married, and concluded that it was worth $170,000 on that date.

Irish testified that the value of the Seattle property is based primarily on the land, rather than being a function of improvements to the structure thereon. He explained that Seattle is bounded by water on the east and west and by other communities on the north and south and that thus, there is no land available for growth of the city except to the north or south. This limitation, he said, contributes to the increase in land values. Because Seattle has little room to grow, Irish stated, it "is the land that's what matters. The value is in the land in Seattle." Irish also stated that "gentrification" is ongoing around the location of the Seattle property. Irish explained that gentrification occurs when an area becomes popular to the wealthy and people who have previously occupied the area are pushed out because prices rise rapidly. Properties in the area are completely redeveloped or significantly rehabilitated.

When asked whether certain improvements that the parties testified they had made after they married would have increased the value of the Seattle property, Irish opined that the improvements would "[n]ot significantly" have increased the Seattle property's value because a buyer might raze the house and build a new one on the site. According to Irish, the specific improvements to which the parties testified would affect the value of the Seattle house "[a] trifle" and "nominally" and make a "slight difference."

The trial court received King County assessor's records for the Seattle property which valued the Seattle property at $83,000 in 1998 and $111,000 in 2000, the year Andrew sold the property. The assessor's records valued the house and the land separately and reflected that the house increased in value from $61,000 in 1998 to $82,000 in 2000. Irish testified that the appraisals done by the county assessor's office were not accurate. He explained that in Washington, assessed valuations lag because the taxable status date for a given property is January 1 of the year prior to the year in which a tax bill is sent. For example, 2003 property taxes would be based on assessed values as of January 1, 2002, and those valuations would be based on the sales data as shown by excise tax affidavits for 2000 and 2001. For this reason, Irish opined, the assessor's records did not represent the full and true value of the Seattle property.

Dwight L. Johnson testified that he is a licensed appraiser in Nebraska and had been a senior residential appraiser since 1971. Johnson appraised some properties in Washington at the beginning of his career. He stated that the appraisal principles and techniques used in Washington were not different from those used in Nebraska. In preparation for his testimony, Johnson reviewed Irish's trial testimony and Irish's appraisal of the Seattle property. He also obtained information from the county assessor to familiarize himself with the Seattle property. Johnson never appraised any property in Seattle.

Johnson testified that when an appraiser selects comparable properties, he or she should find comparables that are similar to the appraised property in size, style, condition, and age. In Johnson's opinion, only two of the six properties selected by Irish were suitably comparable to the Seattle property. He testified that Irish compared the Seattle property to some comparables that had greater square footage than the Seattle property, without adjusting for that difference. Johnson stated that he would not have applied a square-footage analysis in that manner. Johnson also noted that counter to what he would have done, Irish did not account for the properties' frontage.

Johnson admitted that he had not studied the real estate market in Seattle during the 10 years preceding trial and was not familiar with what had happened to land values in Seattle in the mid- to late 1990's. He testified that he was not familiar with the term "gentrification." However, he maintained that if gentrification was occurring as Irish had described it, Irish's appraisal was flawed because in calculating the value of the Seattle property, he did not show the price of land per square foot or frontage foot. Johnson stated that if the land was as valuable as Irish asserted, an appraiser should be able to find one or two land sales showing the value of land per square foot.

### 4. TRIAL COURT'S DECREE

The trial court entered a dissolution decree on March 21, 2003. Following an extensive analysis of the relevant facts and law, it awarded the Lincoln house to Andrew, as well as the household furnishings in that residence.

## III. ASSIGNMENTS OF ERROR

Joyce assigns that the trial court erred in (1) finding that the remodeling done to the Seattle property after the parties' marriage was funded entirely by Andrew, (2) finding that there was not evidence to show what work had been done on the Seattle property after the marriage, (3) finding that Joyce had not acquired an interest in the Seattle property, (4) not finding that the increase in value of the Seattle property was community property, (5) failing to recognize an equitable lien in the Seattle property in favor of Joyce, (6) finding that the costs of remodeling the Seattle property were paid solely through Andrew's separate funds, (7) finding that Andrew paid the $150,000 downpayment on the Lincoln property with his separate funds, (8) finding that Andrew rebutted the presumption of a gift to Joyce of one-half of the equity in the Lincoln property, and (9) finding that Andrew purchased the parties' furniture with his separate funds and that it was Andrew's separate property.

## IV. STANDARD OF REVIEW

In actions for the dissolution of marriage, the division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.*

## V. ANALYSIS

Joyce argues that the trial court erred in finding that Andrew used separate funds to pay the downpayment on the Lincoln house and to purchase the furniture for that house. There is evidence that the funds used for those expenditures came from the proceeds of the sale of the Seattle property, which Andrew had purchased with his inheritance prior to the marriage. If a spouse receives a gift or inheritance which is traceable, usually

that property is set off to that spouse and not included in the marital estate. See *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001).

██ We note that in their briefs, both parties have utilized Washington law to determine the characterization of the Seattle property. Generally, "the law of the situs shall exclusively govern in regard to all rights, interests and titles in and to immovable property." (Emphasis omitted.) *Morris v. Linton*, 74 Neb. 411, 417, 104 N.W. 927, 929 (1905). In the context of marriage, when a spouse owns an interest in land at the time of the marriage, the effect of marriage upon that interest is determined by the law that would be applied by courts of the situs. Restatement (Second) of Conflict of Laws § 233 (1971). In the instant case, Andrew acquired the Seattle property before the marriage and the parties resided in the State of Washington at the time of the marriage and continued to reside in that state until they moved to Nebraska after disposition of the Seattle house. Because the parties then resided in Washington, where the Seattle property was situated, a Washington court would have applied Washington law to determine Joyce's interest, if any, in the Seattle house. Therefore, we apply Washington law to consider whether Andrew met his burden of showing that the Seattle property was nonmarital in character. See *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000) (burden to show property is nonmarital remains with person making such claim).

### 1. SEATTLE PROPERTY

██ Under Washington law, the character of property as separate or community is established when it is acquired. *Marriage of Skarbek*, 100 Wash. App. 444, 997 P.2d 447 (2000). Property acquired during marriage is presumed to be community property. *Dean v. Lehman*, 143 Wash. 2d 12, 18 P.3d 523 (2001). See, also, Wash. Rev. Code Ann. § 26.16.030 (West 1997). Property acquired before marriage is presumed to be separate. *Marriage of Skarbek, supra*; Wash. Rev. Code Ann. §§ 26.16.010 and 26.16.020 (West 1997). Andrew acquired the Seattle property before he married Joyce; therefore, it is presumed to be separate property.

██ So long as it can be traced and identified, separate property remains separate "through changes and transitions." *Marriage of*

*Pearson-Maines*, 70 Wash. App. 860, 866, 855 P.2d 1210, 1214 (1993). Any increase in the value of separate property is presumed to be separate property, but this presumption may be rebutted by direct and positive evidence that the increase is attributable to community funds or labors. *Marriage of Elam*, 97 Wash. 2d 811, 650 P.2d 213 (1982). This rule entitles each spouse to the increase in value during the marriage of his or her separately owned property, except to the extent to which the other spouse can show that the increase was attributable to community contributions. *Id.* Thus, if there is direct and positive evidence that the increase in value of separate property is attributable to community labor or funds, the community may be equitably entitled to reimbursement for the contributions that caused the increase in value. See *id.* Moreover, the community should be entitled to a share of the increase in value due to inflation in proportion to the value of community contributions to the property. *Id.* The party with the separate property may defend against the claim that the community has an equitable interest by showing that the increase in value is attributable not to contributions by the community, but to qualities inherent in the asset, such as market trends and inflation. See *Marriage of Lindemann*, 92 Wash. App. 64, 960 P.2d 966 (1998).

Joyce argues that the trial court erred in failing to find that the Seattle house's increase in value was community property and in failing to recognize an equitable lien in the Seattle house in her favor. She asserts that the Seattle house increased in value due to renovations accomplished through community funds and labors.

█ Irish testified that the properties in the area of the Seattle property had significantly increased in value due to gentrification and that most of the Seattle property's value lay in the land, not the structure thereon. He explained that specific improvements to the house would increase the value only "[a] trifle," "nominally," or "[n]ot significantly." Joyce contends that the trial court erred in relying on Irish's appraisal because it was based on inaccurate facts and was not properly prepared, as testified by Johnson. However, when evidence is in conflict, this court, in its de novo review, may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001). We digress to note that

property tax assessment records were received without objection. See *First Nat. Bank of York v. Critel*, 251 Neb. 128, 555 N.W.2d 773 (1996) (property tax assessment valuation received without objection had some relevance to determination of minimum value of foreclosed land). However, although the tax records showed that the value of the house increased after the marriage, they do not indicate whether the renovations caused the increase, and Irish discounted the records' accuracy.

Basing our conclusion on the evidence and giving weight to the trial court's acceptance of Irish's testimony, we cannot say that the trial court abused its discretion in finding that Joyce had acquired no interest in the Seattle property, because there was no direct and positive evidence that Joyce's efforts to improve the property increased its value. Having so concluded, we need not consider Joyce's remaining assignments of error regarding the Seattle property. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

### 2. Lincoln Property

#### (a) Tracing

Joyce assigns that the trial court erred in finding that Andrew used his separate funds to make the $150,000 downpayment on the Lincoln house. She asserts that the trial court should not have permitted the tracing of the proceeds from the sale of the Seattle house through sale and reinvestment.

> It has been a longstanding rule that when awarding property in a dissolution of marriage, property acquired by one of the parties through gift or inheritance . . . which property is readily identifiable and traceable to that party, ordinarily is set off to the individual receiving the inheritance or gift and is not considered a part of the marital estate.

(Citations omitted.) *Grams v. Grams*, 9 Neb. App. 994, 1013, 624 N.W.2d 42, 58 (2001). Andrew invested his inheritance in the Seattle property. That property increased in value without the aid of community efforts, and we have concluded that it was Andrew's separate property in its entirety when Andrew sold it. Andrew used the proceeds from that sale for the downpayment on the Lincoln property. Andrew's inheritance is readily traceable

throughout these transactions. Upon our de novo review, we conclude that the trial court did not abuse its discretion in effectively tracing Andrew's inheritance to the downpayment on the Lincoln property.

Joyce argues, citing *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985), that tracing premarital funds through sale and reinvestment is disfavored by Nebraska courts. In *Rezac*, certain land and a veterinary clinic were purchased during the parties' marriage and the trial court included these assets in the marital estate. The husband argued that the assets were purchased with proceeds from the sale of other property owned by him before the marriage, suggesting that the court should trace the premarital property through its disposition and reinvestment during the marriage in order to preserve the separate character of the land and veterinary clinic. The Nebraska Supreme Court upheld the trial court's decision, stating:

> Tracing property is generally an unworkable proposition because the parties have a tendency to suggest tracing only when there is an improvement in value. Although some courts find a justifiable reason for limited tracing of prior owned property, it is not error to restrict the credit to the identical property which is retained during the marriage or to the value of the property at the time of the marriage or when disposed of during the marriage.

*Id.* at 519, 221 N.W.2d at 198. Thus, although the court in *Rezac* upheld the trial court's decision not to allow tracing, it did not preclude tracing as a technique in a proper case, and under the facts of this case, we have concluded that the trial court did not abuse its discretion in allowing tracing.

Joyce cites *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001), for the proposition that without receipts, canceled checks, or other evidence to show how the marital property was disposed, Andrew's testimony is not sufficient to exclude the downpayment on the Lincoln property from the marital estate. In *Grams*, this court found that the trial court abused its discretion in allowing the tracing of $17,000 from a premarital savings account which the wife testified she spent to support herself and her children after the parties' separation. In doing so, this court applied *Brunges v. Brunges*, 260 Neb. 660, 665, 619 N.W.2d 456, 461

(2000), in which the Nebraska Supreme Court found that the husband did not properly account for the disposition of marital property after the parties' separation because he either did not offer an explanation as to the disposition of certain funds or testified that certain funds had been " 'put towards [sic] bills' " without documentation or testimony as to the specific bills that he paid.

The present case is distinguishable from *Grams*. In *Grams*, this court disapproved tracing because the wife used premarital funds to defray unspecified, and presumably sundry, expenses. In the instant case, Andrew immediately applied the Seattle house sale proceeds to the downpayment on the Lincoln property, the retirement of specific debts, and the purchase of identified items of furniture. Moreover, although we have concluded that the above-stated rule in *Grams* does not apply here, we note that there are debits in Andrew's credit union transaction history report approximating most of the expenditures to which he testified. We also note that while Joyce did not specifically admit that the funds for the downpayment on the Lincoln property came from the Seattle house sale proceeds, her testimony did not contradict Andrew's testimony concerning that source of funds. Based on this evidence, we conclude that the trial court did not abuse its discretion in tracing Andrew's separate property.

### (b) Joint Title

The Lincoln property is titled in both parties' names as joint tenants. Joyce assigns that the trial court erred in finding that Andrew rebutted the presumption of a gift to Joyce of one-half of the equity of the Lincoln house. In so finding, the trial court apparently applied the proposition that when a husband and wife take title to a property as joint tenants, even though one pays all the consideration therefor, a rebuttable presumption arises that the spouse paying the consideration intended to gift one-half of the interest to the other spouse. See *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996), *disapproved, Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003).

In *Schuman*, which was released 1 week before the trial court's opinion in the instant case, the Nebraska Supreme Court specifically disapproved *Gerard-Ley v. Ley, supra*, stating:

> The manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's

determination of how the property will be divided in an action for dissolution of marriage. As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. . . . To the extent that the Court of Appeals' opinion in *Gerard-Ley* can be interpreted to mean that nonmarital property which during a marriage is titled in joint tenancy cannot be considered as a nonmarital asset in an action for dissolution of marriage, such interpretation is expressly disapproved.

How property inherited by a party before or during the marriage will be considered in determining the division of property or an award of alimony must depend upon the facts of the particular case and the equities involved. . . . If the inheritance can be identified, it is to be set off to the inheriting spouse and eliminated from the marital estate.

(Citations omitted.) 265 Neb. at 469-70, 658 N.W.2d at 39. In the instant case, we apply the principles reiterated in *Schuman* rather than the rationale from *Gerard-Ley* apparently utilized by the trial court.

 As we have already discussed, the downpayment on the Lincoln house is readily traceable to Andrew's inheritance. Moreover, Andrew used funds traceable to his inheritance to make mortgage payments for the "first few months" and continued to make the mortgage payments from his checking account thereafter. Joyce made no financial contribution to the Lincoln property. On a de novo review of the facts in this case, we conclude that the trial court did not err in awarding the equity in the Lincoln property to Andrew, regardless of the fact that the parties held title to that property as joint tenants. See *Crystal Clear Optical v. Silver*, 247 Neb. 981, 531 N.W.2d 535 (1995) (where record demonstrates that decision of trial court is correct, although such correctness is based on different ground from that assigned by trial court, appellate court will affirm).

Joyce urges that the equities of the case entitle her to a share in the equity of the Lincoln property. She asks us to consider her contributions to the improvement of the Seattle house and to living expenses during Andrew's unemployment. As we have concluded above, the evidence does not support a finding that the

improvements to the Seattle house increased its value. Moreover, the evidence shows that both Joyce and Andrew contributed to household expenses during the marriage and that Andrew paid Joyce's student loan and credit card payments while Joyce was unemployed. Considering the equities of the case, we conclude that the trial court did not abuse its discretion in tracing and allocating Andrew's inheritance.

### 3. FURNITURE

Joyce assigns error to the trial court's findings that Andrew purchased the parties' furniture with separate funds and that the furniture was Andrew's separate property. Andrew testified that he paid for the furniture and antiques with funds from his checking account in Seattle, and Andrew's credit union transaction history report affirms that Andrew purchased over $8,000 in furniture and antiques using the funds in his checking account. Andrew stated that everything was purchased from the proceeds of the sale of the Seattle house. Joyce testified that it was assumed that the furniture belonged to both of them but confirmed that the furnishings were purchased with, "for the most part," the proceeds from the sale of the Seattle property. Because we have concluded that the proceeds from the sale of the Seattle property were Andrew's separate property, we also conclude that the trial court did not abuse its discretion in finding the furniture Andrew purchased with those proceeds to be his separate property. See *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001).

## VI. CONCLUSION

For the foregoing reasons, we affirm, concluding that the trial court did not abuse its discretion in dividing the property between the parties.

AFFIRMED.