IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SPADY V. SPADY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SANDRA LYNN SPADY, APPELLANT AND CROSS-APPELLEE,

V.

JERRY FRED SPADY, APPELLEE AND CROSS-APPELLANT.

Filed June 7, 2016.    No.  A-15-426.

Appeal from the District Court for Adams County: TERRI S. HARDER, Judge. Affirmed as modified.

Nathan T. Bruner, of Bruner Frank, L.L.C., for appellant.

John S. Slowiaczek and Virginia A. Albers, of Slowiaczek, Albers & Astley, P.C., L.L.O., for appellee.

INBODY and RIEDMANN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Sandra Lynn Spady appeals and Jerry Fred Spady cross-appeals from the order of the district court for Adams County which dissolved their marriage, divided the marital estate, and declined to find Jerry in contempt of court. As explained below, we affirm as modified.

## II. BACKGROUND

Sandra and Jerry met in Acapulco, Mexico in 1981 and were married in February 1991. At the time of the marriage, Sandra was 38 years old and Jerry was 55 years old. Prior to meeting Jerry, Sandra worked as a successful fashion designer in Mexico, where she gained Mexican

citizenship. She took a leave of absence from her job in 1982 and returned to Nebraska with Jerry. She never resumed her prior employment or any paid employment throughout the marriage.

Jerry entered the marriage with significant assets including real estate and several businesses. He was the sole owner of Jerry Spady Pontiac Cadillac (JSPC); Bonnavilla Plaza Corporation (BPC); the property located on Osborne Drive East in Hastings, Nebraska that houses JSPC; and a residence in Hastings located on West Prairie Lake Road referred to as "Casa Lolita." During the marriage, Sandra and Jerry purchased four properties in Acapulco, a residence in Florida, and two boats. We will describe the parties' marital and separate property in greater detail in the analysis section below.

Sandra filed a complaint for dissolution of marriage in April 2013. The dissolution trial was held in January 2015. At the same time, the court held a show cause hearing on Sandra's claim that Jerry failed to maintain the properties in Mexico as required in a temporary order.

The decree and contempt order were entered on April 17, 2015. The district court rejected Sandra's claims that much of Jerry's premarital property should be classified as marital property, and Jerry's premarital property was excluded from the marital estate. One of the Mexico properties was sold prior to trial, and Sandra was awarded the remaining three properties. Jerry received the Florida residence and the boats. Although Jerry had been ordered to pay temporary alimony to Sandra during the pendency of the proceedings, the district court declined to award Sandra permanent alimony. The court also declined to hold Jerry in contempt but found that Sandra had paid expenses related to the properties in Mexico that should have been paid by Jerry. Thus, the court provided a credit of $97,500 to Sandra. After classifying, valuing, and dividing the marital estate and allowing for the $97,500 credit, the court ordered Sandra to pay an equalization payment of $260,744 to Jerry. Sandra now appeals and Jerry cross-appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Sandra assigns that the district court erred in (1) failing to include JSPC in the marital estate, (2) failing to include the Osborne Drive East property in the marital estate, (3) parceling out BPC and failing to include the totality of BPC in the marital estate, (4) including Jerry's loan to pay temporary attorney fees in the marital estate, (5) valuing the debt known as Account 293, (6) providing Jerry a tax credit for parceling out BPC, (7) failing to award her alimony, and (8) failing to find Jerry in contempt.

On cross-appeal, Jerry assigns that the district court erred in awarding an excessive amount of temporary alimony and crediting $97,500 against the equalization payment.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. MARITAL ESTATE

Sandra argues that the district court erred in failing to classify JSPC, the Osborne Drive East property, and all property owned by BPC as marital property. She also claims that the court erroneously classified a loan Jerry secured to pay her temporary attorney fees as marital property. We reject Sandra's claims as to Jerry's premarital property but agree with her regarding the loan for attorney fees. That portion of the decree is therefore reversed, and the equalization payment is modified as explained below.

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Brozek v. Brozek, supra*. Equitable property division is a three-step process. *Id*. The first step is to classify the parties' property as marital or nonmarital. *Id*. The second step is to value the marital assets and marital liabilities of the parties. *Id*. The third step is to calculate and divide the net marital estate between the parties. *Id*. Our focus is on the first step of this process.

### (a) JSPC

Sandra acknowledges that Jerry owned JSPC prior to the marriage, but she contends that it should have been included in the marital estate because corporate funds were commingled with marital property, JSPC was the alter ego of Jerry, and she made significant contributions to the business during the marriage. JSPC is an automobile dealership Jerry purchased when he was 24 years old. When the parties married, Jerry owned 100 percent of the stock shares. During the marriage, he gifted stock through Sandra to his son and nephew for estate planning purposes, and at the time the parties separated, Jerry retained approximately 47.49 percent of the shares. Sandra estimated the value of Jerry's remaining JSPC stock to be $1,349,165, an amount Jerry disputed.

### *(i) Commingling*

Generally, all property a spouse acquired before the marriage is excluded from the marital estate. See *Brozek v. Brozek, supra*. Separate property becomes marital property by commingling if it is inextricably mingled with marital property or with the separate property of the other spouse. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). If the separate property continues to be segregated or can be traced into its product, commingling does not occur. *Id*.

Sandra first claims that commingling occurred when Jerry mixed personal funds with JSPC funds through an account contained on the JSPC general ledger referred to by the parties as "Account 293." Because commingling occurs when separate property is "inextricably mingled" with marital property, the question becomes whether Jerry's separate property remained segregated or can be traced. Jerry testified in the affirmative.

Jerry explained at trial that Account 293 is his personal account. Instead of maintaining a separate personal bank account, he deposits all of his income into Account 293 and charges the majority of his expenses to a credit card, which the JSPC bookkeeper then pays using funds from Account 293. In some instances, personal company checks were written for Jerry's personal expenses and then charged to Account 293. In Jerry's words: "What I receive in income, all my everything is in that account. And what I spend in income is all personal account and that's all it

is." Exhibits showing the entries made to Account 293 were received into evidence. The account displays credits for income Jerry received and debits for Jerry's general, personal expenses.

For purposes of a commingling analysis, a spouse can establish a "tracing link" through his own testimony, subject to the trial court's assessment of his credibility. See *Brozek v. Brozek*, 292 Neb. 681, 701, 874 N.W.2d 17 (2016). In rejecting Sandra's commingling claim, the district court clearly found Jerry's description of Account 293 credible. We find no abuse of discretion in that determination because, although Jerry's personal funds and JSPC funds may have been physically contained in the same account at the bank, Jerry's personal income and expenditures were logged separately and, thus, were not inextricably mingled with corporate funds.

Sandra also claims that commingling occurred when Jerry transferred JSPC stock shares through her to third parties. We disagree.

Jerry's shares of stock are a representation of his ownership interest in JSPC. Because we agree with the trial court that Sandra's contributions to the business are not significant enough to convert Jerry's ownership interest to marital property, as explained in more detail below, the fact that Jerry gifted stock through her to third parties is irrelevant. Jerry owned 100 percent of the stock shares at the time of the marriage, and during the marriage, he gave away a little over half of his shares to his son and nephew for estate planning purposes. These acts did not transform Jerry's remaining shares into marital property when Sandra has no ownership interest in the business. Any shares that could be considered "commingled" by way of Jerry gifting them to Sandra in order for her to gift them to others are no longer owned by Jerry. The shares remaining in his possession at the time of separation remain titled solely in his name, as they have always been. Therefore, JSPC was properly excluded from the marital estate.

*(ii) Alter Ego*

Sandra also claims that JSPC was the alter ego of Jerry, and therefore, the corporation should be considered a marital asset. A corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). However, in equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice. *Id.*

When a corporation is or becomes the mere alter ego, or business conduit, of a person, it may be disregarded. *Id.* Among the factors which are relevant in determining to disregard the corporate entity are diversion by the shareholder or shareholders of corporate funds or assets to their own or improper uses and the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity. *Id.* Relevant factors also include the insolvency of the individual and the extent to which the individual's ostensible poverty is supported by corporate assets. See *id.*

In *Medlock v. Medlock, supra*, the Nebraska Supreme Court found the corporation to be the alter ego of the husband because the husband made extensive personal use of corporate funds and assets and carried on personal dealings in the name of the corporation. The record also showed a virtually complete unity of interest between the husband and the corporation. The husband exercised nearly unfettered control of the corporation and regularly purchased vehicles, travel, and

other goods and services in the corporate name for his family's personal use. The record further demonstrated that the family did not acquire personal property in their own names but in the name of the corporation, and the husband's purported poverty conflicted sharply with the affluent lifestyle he maintained with the use of corporate assets. The husband's ability to maintain his family's manner of living with no reported assets and a meager income was also significant to the court's determination that the corporation was the husband's alter ego.

The same factors are not present in the instant case. Sandra again points to Account 293 to argue that Jerry's personal funds were commingled with JSPC funds, but as determined above, we do not agree. Unlike the husband in *Medlock*, Jerry relinquished control of JSPC during the marriage by gifting the majority interest of the corporation to his son, and the record here establishes that Sandra and Jerry acquired assets in their personal names and under BPC during the marriage. The couple held significant assets during the marriage, including expensive properties in Nebraska, Florida, and Mexico, and Jerry continued earning more than $15,000 per month in income plus annual bonuses from JSPC. Jerry's hard work prior to the marriage and the significant assets he owned at that time supported the couple's lifestyle and ability to acquire additional property and travel extensively during the marriage. There is no evidence that products were purchased in JSPC's name for personal use or that Jerry carried on personal dealings under the name of JSPC. Accordingly, we cannot find that JSPC was the alter ego of Jerry, and thus, the district court did not abuse its discretion in finding JSPC to be Jerry's premarital property.

### (iii) Sandra's Contributions

As noted above, property owned prior to the marriage is generally not part of the marital estate. See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Sandra recognizes this general principle and agrees that Jerry owned JSPC prior to the marriage. Despite this, she claims that the court should have classified JSPC as marital property based on the exception set out in *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982).

The *Van Newkirk* exception applies where both of the spouses have contributed to the improvement or operation of the property which one of the parties owned prior to the marriage or received by way of gift or inheritance, or the spouse not owning the property prior to the marriage or not receiving the gift or inheritance has significantly cared for the property during the marriage. See *Van Newkirk v. Van Newkirk, supra*.

At trial, Sandra adduced evidence of the extent of her contributions to JSPC such as working in various roles for the corporation and sitting on its board of directors. However, the district court found that the impact of Sandra's contributions was "simply not credible" and "overstated," noting that Jerry built a successful business prior to the marriage and had employees running its daily operations.

Sandra claims her contributions to JSPC were similar to those made by the wife in *Plog v. Plog*, 20 Neb. App. 383, 824 N.W.2d 749 (2012). There, we applied the *Van Newkirk* exception based on the wife's contributions to the couple's farming business. The husband and wife were both directly involved with the calving, branding, and vaccination of their own animals, and the wife maintained the bookwork of the farming business and the husband's veterinary clinic. The husband and wife worked full-time at these businesses, and their income was earned through that work.

To the contrary here, Jerry retired from working at the time of the marriage, and he and Sandra traveled outside of Nebraska for nine months out of the year, remaining in Hastings for just three months in the summer. The day-to-day operations of the dealership were conducted by a general manager and other employees. The income Jerry earned during the marriage was derived from rent payments JSPC made to him as the owner of the building housing the dealership; neither he nor Sandra earned a salary or wages from JSPC. Though Sandra may have filled in where necessary and taken on various roles within JSPC, unlike the wife in *Plog*, Sandra's work was not full-time, day to day in order to earn income to support the couple. Thus, we find the situation in *Plog* distinguishable from the present circumstances.

As such, we conclude that the district court did not abuse its discretion in finding that Sandra's contributions to JSPC do not rise to the level required to convert Jerry's separate property to a marital asset. Accordingly, JSPC was properly excluded from the marital estate.

(b) Osborne Drive East Property

Sandra argues that the district court erred in finding that the Osborne Drive East property was nonmarital. She acknowledges that the property was deeded to Jerry prior to the marriage but argues that it should be considered marital property because the construction was completed during the marriage and she made significant contributions to its construction. The asset referred to as the "Osborne Drive East" property is the land and building which house the JSPC dealership. Jerry purchased the land in 1989 and obtained a construction loan to fund construction of the structures, which was completed early into the marriage. Jerry satisfied the $850,000 balance of the construction loan with proceeds from the sale of a premarital property he owned in Acapulco. The district court thus determined that the Osborne Drive East property was Jerry's premarital property because he acquired it prior to marriage and used premarital funds to pay off the loan.

The law is that if premarital property can be identified, it is typically set off to the spouse who brought the property into the marriage. *Charron v. Charron*, 16 Neb. App. 724, 751 N.W.2d 645 (2008). But when the actual premarital property no longer exists, then the question of whether there should be a setoff becomes more problematic. *Id.* The Nebraska Supreme Court has noted inherent problems with tracing premarital property through disposition and reinvestment during the marriage. See *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985) (noting that parties tend to suggest tracing only when there is improvement in value but noting it is not error to restrict credit to identical property which is retained during marriage or to value of property at time of marriage or when disposed of during marriage). So long as it can be traced and identified, separate property remains separate through changes and transitions. See *Quinn v. Quinn*, 13 Neb. App. 155, 689 N.W.2d 605 (2004).

Here, Jerry's separate property can be identified and remained separate. Jerry purchased the land before the marriage and secured a construction loan in order to build the physical structures which house the dealership. He sold Casa Tanque, a premarital residence, and proceeds from the sale were used to pay off the construction loan. Documentary evidence supporting the sale of Casa Tanque and the loan payoff were received into evidence at trial. Thus, premarital funds were used to fund construction on premarital property. The fact that the building construction was completed after the date of marriage does not convert the property to a marital asset when premarital funds were used to purchase the land and pay for the construction.

- 6 -

Sandra also argues that the Osborne Drive East property should not be considered Jerry's premarital property because she significantly contributed to the construction of the property during the marriage. However, as stated above, the construction was funded by Jerry's premarital money. Further, Sandra did not produce evidence of the increase in value her contributions had on the property as required by the *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982) exception. See *Tyler v. Tyler*, 252 Neb. 209, 570 N.W.2d 317 (1997) (when *Van Newkirk* exception is applied, it requires evidence of the value of the contributions and evidence that the contributions were significant). Therefore, the record supports the district court's conclusion, and we find no abuse of discretion in classifying the Osborne Drive East property as Jerry's premarital property.

### (c) BPC Property

Sandra asserts that the district court erred when it "parceled out" the assets contained in BPC and failed to include the totality of BPC in the marital estate. BPC is a corporation Jerry created in 1977 that holds rental properties. At the time of the marriage, BPC owned several properties including a mobile home park and two storage buildings. Several properties Jerry and Sandra purchased during the marriage were ultimately transferred to BPC's ownership. Thus, when the parties separated, the marital assets owned by BPC included the residence in Florida and the three properties in Acapulco which were known as Casa Iguana, Casa Delfin, and 501 Ave del Parasio. Sandra argues that should have been classified as marital property because Jerry commingled premarital assets and marital assets under BPC, BPC was the alter ego of Jerry, and she made significant contributions to the corporation.

Notwithstanding Sandra's specific assertions, the underlying question is whether Jerry's premarital assets remained separate or can be traced. See *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015) (separate property does not become marital property if it continues to be segregated or can be traced into its product). Even though marital assets ended up under the ownership of BPC alongside premarital assets, the separate and marital assets are easily identifiable and the properties themselves remained separate entities. BPC's assets were listed separately on the parties' joint property statement, and their values were appraised individually. Sandra acknowledged that BPC's total value is comprised of the sum of the value of its assets, and the district court found that the parties themselves "parceled out" the corporate assets, a factual finding which is supported by the record. The three properties located in Mexico were owned by BPC but always titled in Sandra's name because she has Mexican citizenship. Sandra argues that she made significant contributions to BPC, but the contributions she highlights were to the marital assets owned by BPC. There is no evidence she significantly contributed to or improved the premarital assets owned by BPC. We therefore find that the district court did not abuse its discretion in "parceling out" the assets of BPC, awarding some to Jerry as his premarital property and including the remaining assets in the marital estate.

### (d) Jerry's Loan for Attorney Fees

Sandra's final claim with respect to the district court's classification of property is that the court erred in classifying a loan Jerry secured to pay for Sandra's temporary attorney fees as a marital debt because it was incurred after the parties separated. We agree.

A marital debt is defined as a debt incurred during the marriage and before the date of separation, by either spouse or both spouses, for the joint benefit of the parties. See *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 823 N.W.2d 697 (2012). In *Finley-Swanson*, we held that the attorney fees incurred by the parties during the pendency of the dissolution proceedings did not constitute a marital debt because they were incurred after the parties were estranged and the wife filed the complaint for dissolution of marriage, and they were clearly not for the parties' joint benefit.

The same is true in the present case. In an August 2013 temporary order, the district court found that $118,000 in attorney fees should be awarded to Sandra along with expert witness fees of $50,000. Jerry obtained a $168,000 loan in order to satisfy the court's order, and the loan was included on his property statement as a marital debt. In the decree, the district court observed that it entered the temporary order to assure that Sandra had funds available to her to proceed with the dissolution action but that the award was not "free money" for Sandra. Thus, the court concluded that it would be equitable to include the $168,000 debt as part of the marital division.

As in *Finley-Swanson*, the fees awarded to Sandra in the temporary order were incurred after she and Jerry separated, after she commenced the dissolution action, and were not for their joint benefit. Further, in the temporary order, the court specifically rejected Jerry's suggestion that instead of awarding Sandra attorney fees, the court should order him to "advance funds" to her which would be counted as a "credit" against the final division of marital property. Yet in the decree, the court found that it would be equitable to include the attorney fee loan as a marital debt. We find this to be an abuse of discretion and reverse this portion of the decree. Accordingly, we reduce the equalization payment due from Sandra to Jerry to $92,744.00.

## 2. VALUATION OF ACCOUNT 293

Sandra claims that the district court erred in its valuation of Account 293, arguing that instead of the negative balance of $168,482 imposed by the court, the true value of the account is a negative balance of $73,621 as reflected on the April 2013 dealer report. We find no abuse of discretion in the value assigned by the district court.

According to the parties' joint property statement, Jerry assigned a value of negative $332,863 to Account 293. He explained at trial that prior to separation, the account had a positive balance, but after the attorney fees and temporary alimony he was paying, the balance had declined and the account now represents a debt. Sandra disputed that the account represented a marital debt because most of the expenses were incurred after separation.

The district court recognized the parties' dispute and determined that $168,482 of Jerry's value was marital, that portion representing the amount paid for the parties' 2012 tax liabilities and tax preparation costs. This amount is supported by the general ledger detail for Account 293 for April 2013, which shows that Jerry made two payments for 2012 taxes in the amounts of $39,857 and $124,018 on April 15; a 2012 tax payment of $3,626.88 on April 17; and paid $980 for tax preparation fees on April 23. Because income tax liability incurred during the marriage is one of the accepted costs of producing marital income, income tax liability should generally be treated as a marital debt. *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000).

Sandra bases her argument on the April 2013 dealer report which shows that as of April 30, Account 293 had a negative balance of $73,621.00. This total includes deposits made to the

account after the 2012 taxes and fees were paid. The district court could have adopted Sandra's suggested amount, but it chose not to. Instead, it determined that only the tax liabilities paid from Account 293 were a marital debt, and we find no abuse of discretion in this factual finding.

### 3. TAX CREDIT FOR BPC PROPERTY

Sandra asserts that the district court erroneously awarded Jerry a tax credit for the Mexico properties. The district court awarded Casa Iguana, Casa Delfin, and 501 Ave del Parasio to Sandra and gave Jerry a credit for the tax consequences that will result when he transfers ownership of the properties from BPC to Sandra. Sandra claims this credit was erroneous because it was speculative and places the tax consequences solely on Sandra.

Because the division of property is a matter entrusted to the discretion of the trial judge, a court's consideration of the tax consequences of the sale of a business are reviewed for an abuse of discretion. See *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). We find no abuse of discretion here.

The Nebraska Supreme Court has held that it is proper to consider the tax consequences of the sale of a business when the court finds that the sale is reasonably certain to occur in the near future or when the property division award will, in effect, force a party to sell his or her business in order to meet the obligations imposed by the court. See *Schuman v. Schuman, supra*. Similarly, the Nebraska Supreme Court concluded that where income tax would eventually have to be paid on an IRA at issue in the division of marital property, it is proper to consider the future tax consequences in determining the present value of the IRA. See *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988). In other words, when tax consequences are fairly certain to arise from the sale or transfer of property, they may be considered when valuing the property.

Here, the Mexico properties are titled in Sandra's name, but are listed as assets of BPC. A certified public accountant testified that there would be tax consequences if Jerry transfers the Mexico properties from BPC to Sandra, which the court ordered Jerry to do. Thus, the tax consequences are certain to occur. Sandra asserts that Jerry should not now be allowed the benefit of the tax consequences when it was his decision to transfer ownership of the properties to BPC, and that BPC should be kept whole rather than parceling out its assets. As we determined above, we find no error in the court's decision to parcel out the assets of BPC, and as Jerry notes, the Mexico properties are already titled in Sandra's name and she is the only one who is able to conduct business in Mexico.

Sandra also argues that the estimated tax consequences are too speculative to be reliable. She asserts that the fact that the accountant had to prepare six sets of "pretend taxes" to estimate the potential tax liability is evidence that the taxes are speculative. Brief for appellant at 26.

The accountant explained that when appreciated property is distributed out of an "S" corporation, it is treated as if the property has been sold. So the gain, which would be passed down to Jerry's personal tax return, is calculated as the fair market value less the basis. The accountant described the methodology he used to calculate the estimated capital gains taxes; namely, he utilized the average of Jerry's income from 2011, 2012, and 2013; the agreed upon values for the properties; and a depreciation schedule to arrive at the estimated taxes. He also testified that a week prior to trial, he participated in a conference call with Jerry's counsel, Sandra's counsel, and three other certified public accountants to discuss his methodology of calculating the tax

- 9 -

consequences, and no one objected to his methodology. Six exhibits displaying the calculations were received into evidence. The accountant prepared a separate report for each of the four Mexico properties, including the property that had already been sold, and two exhibits showed the total consolidated calculations. The fact that the numbers provided were estimates does not mean they are too speculative to support a tax credit, given the accountant's explanation of his calculations. We therefore find no abuse of discretion in the court's awarding Jerry a tax consequence for the BPC properties.

## 4. ALIMONY

Sandra claims the district court erred in failing to award her permanent alimony, and on cross-appeal, Jerry contends the court erred in awarding an excessive amount of temporary alimony.

In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008), a court should consider the income and earning capacity of each party and the general equities. *Id*.

The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately. *Id*. The purpose of a property division is to distribute the marital assets equitably between the parties. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Id*. However, although the division of the marital estate and the award of alimony are separate inquiries under § 42-365, it does not mean that a party's resources are irrelevant to her need for alimony. See *id*.

In the present case, the district court declined to award Sandra alimony, finding that she is "very talented and capable and has many marketable skills." The court also noted that Sandra received a significant amount of temporary alimony during the two years the divorce was pending and received three income producing properties in Mexico via the property division.

As the Supreme Court acknowledged in *Brozek*, the length of Sandra and Jerry's marriage and disparity of their incomes favors an award here; however, no children were born during the marriage, and although Sandra was not monetarily compensated for the work she performed during the marriage, she contributed to the marriage by helping to build up the Mexico properties and rent them out for a profit as well as filling in for various roles with JSPC. She presented expert testimony at trial establishing the compensation she could expect to earn from the various job duties she performed. In addition, she received significant assets in the property division, including the four properties in Mexico valued at a total of $1,742,304, and approximately $254,000 in temporary alimony while the action was pending. We therefore find no abuse of discretion in the district court's decision to award no permanent alimony to Sandra.

On cross-appeal, Jerry assigns that the district court erred in awarding an excessive amount of temporary alimony. Before addressing Jerry's claim, we must address Sandra's contention that

the issue is not properly before us. We have previously found that temporary child support and alimony obligations are not final and appealable at the time they were entered, but become final upon entry of the decree dissolving the parties' marriage. See *Kosiske v. Kosiske*, 8 Neb. App. 694, 600 N.W.2d 840 (1999). We concluded that the issue of temporary alimony was therefore properly before us in *Kosiske* upon the appeal from the final decree. Similarly, Jerry's claim with respect to the temporary alimony awarded to Sandra is now properly before this court.

A judgment, order or decree for the payment of temporary alimony may be modified or set aside upon a proper showing by the court which rendered it, as circumstances may warrant. See *Cain v. Miller*, 109 Neb. 441, 191 N.W. 704 (1922). Here, effective May 1, 2013, the district court ordered Jerry to pay Sandra $8,400 per month in alimony. The court found that Jerry's income was $16,800 per month but that he had access to additional cash through his interest in the corporations. The court decided to set the alimony amount at one-half of Jerry's monthly income and noted that it did not select a higher amount because of the other benefits Sandra received in the order which would normally be paid by alimony. These benefits included the exclusive use of Casa Lolita, exclusive use of the 2013 Cadillac she had been provided by the dealership at Jerry's cost, and $168,000 in attorney and expert witness fees.

Effective September 1, 2014, the temporary alimony award was increased to $15,000 per month. In modifying the amount, the district court observed that Jerry received $567,649.86 in in-kind benefits and cash from JSPC in 2013. Although we agree that JSPC is Jerry's premarital property, a court may consider all of the property owned by the parties, marital and separate, in decreeing alimony. See *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). At the same time it modified temporary alimony, the court allowed Sandra to continue using her vehicle but awarded exclusive use of Casa Lolita to Jerry. Thus, Sandra was required to find new housing at her own expense. We understand Jerry's argument that he was ordered to pay almost his entire monthly income in temporary alimony and that his income had not changed at the time temporary alimony was increased. However, given the district court's comments in the first temporary award and Jerry's access to additional funds beyond his monthly income of $16,800, we cannot find that the district court abused its discretion in increasing the temporary alimony award.

## 5. CONTEMPT

Both Sandra and Jerry challenge the district court's decision on Sandra's motion to hold Jerry in contempt. Sandra argues that the court erred in failing to find Jerry in contempt of court, and Jerry claims the court erroneously credited Sandra $97,500.

In August 2013, the district court entered a temporary order requiring that Jerry maintain the Mexico properties and pay their associated expenses. After 1999, the three properties were rented out for a profit, and a staff cared for the properties while Sandra and Jerry were not there. The properties required extensive care and maintenance, including payment of all related expenses such as staff salaries, utilities, and electric and water bills.

Shortly after the court's temporary order, Jerry attempted to access the properties but was unable to do so because the locks and codes had been changed. As early as May 2013, Jerry was negotiating with a man to be the administrator of the Mexico properties, and he ultimately hired someone to do so in August 2013. The administrator continued to try to access the properties in order to speak with the staff and retrieve bills that were mailed to the properties, but she was

repeatedly denied access. Apparently the administrator Jerry hired lacked the proper authority to work in that capacity in Mexico.

Sandra ultimately filed a motion for order to show cause asking the district court to hold Jerry in contempt of court, enter an order requiring that Jerry reimburse her for expenses she paid to maintain the properties, and enter an order of financial sanctions against Jerry. Sandra and Jerry subsequently filed a temporary stipulation agreeing that Sandra would take over management authority for the properties and that she would account for all income and expenses associated with the management of the properties. The court approved the stipulation, making it retroactive to February 1, 2014.

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

First, we must determine whether the district court abused its discretion when it declined to find Jerry in contempt. When a party to an action fails to comply with a court order made for the benefit of the opposing party, such act is ordinarily a civil contempt, which requires willful disobedience as an essential element. *Id*. "Willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id*. Outside of statutory procedures imposing a different standard, it is the complainant's burden to prove civil contempt by clear and convincing evidence. *Id*.

Here, the record supports the district court's finding that Jerry's actions were not done willfully. Jerry and the administrator each attempted to access the properties on multiple occasions in order to retrieve bills and pay them, but they were unable to do so. The record reflects that Jerry communicated with Sandra about ensuring the staff was getting paid and ensuring that his administrator was allowed to enter the properties. Jerry described his frustration with the inability to access the properties and negotiate with the staff. He explained,

> Bills are sent to the houses down there [in Mexico]. The people in the houses pick up the mail. That's how you get a bill. You get in the car and run down and pay the bill. It's impossible to operate if you don't have somebody to do that for you.

After reviewing the record, we conclude it was not an abuse of discretion for the district court to determine that Sandra failed to prove by clear and convincing evidence that Jerry willfully violated the court order. Accordingly, we affirm the district court's ruling.

Although the court declined to hold Jerry in contempt, it determined that expenses Sandra incurred in maintaining the properties should have been paid by Jerry, and Sandra received a credit of $97,500 against the amount she owed for equalization purposes. On cross-appeal, Jerry argues the amount was in error because it includes expenses Sandra paid after February 2014 when she was in sole control of the properties. We find no merit to this argument.

The evidence establishes that the expenses Sandra paid were past due amounts that Jerry had not paid when he was maintaining the properties and costs incurred to repair the property from lack of maintenance. It is unclear from the record how the district court arrived at a figure of

$97,500 when Sandra submitted expenses of $104,106.16; however, Sandra has not appealed the amount awarded. Because the amount is within the amount requested, we find no error in the court's award.

## VI. CONCLUSION

We conclude that the district court abused its discretion in classifying the $168,000 loan Jerry obtained to pay for Sandra's attorney fees as a marital debt. That portion of the decree is therefore in error, and the equalization payment owed by Sandra is modified to $92,744.00. The remainder of the decree is affirmed.

AFFIRMED AS MODIFIED.

PIRTLE, Judge, participating on briefs.